APPEL, Justice.
In this case, we are called upon to determine if an undocumented noncitizen brought to Iowa as an eleven-year-old child by her parents, educated in Iowa public schools, who has lived in Iowa continuously, who is a mother of four children who are citizens of the United States, and who applied for and was granted deferred action under the Department of Homeland Security’s Deferred Action for Childhood Arrivals (DACA)[1] program, may be prosecuted by State authorities for using false documents to obtain federal employment *741 authorization even though federal law pervasively regulates employment of undocumented noncitizens. The answer to this question is no.
I. Factual Background and Proceedings.
A. Facts Surrounding Martha Martinez.
Martha Martinez came to Muscatine with her parents in 1997 when she was eleven years old. She attended Muscatine public schools and worked for several different employers in Muscatine County.
When she was seventeen years old, Martinez applied for and obtained an Iowa driver’s license. She used a birth certificate in the name of Diana Castaneda, a person with a social security number, to obtain the license. She renewed the license in 2008.
In 2013, Martinez used her fictitious driver’s license and a social security card in the same name to obtain employment at Packer Sanitation, a business located in Muscatine County. The documents were used to obtain what is referred to as 1-9 paperwork.
Also in 2013, Martinez applied for and received temporary lawful immigration status from the Department of Homeland Security pursuant to the DACA program. Because she now had temporary lawful immigration status, she was able to obtain work authorization in her own name from the Department of Homeland Security.
Because of her lawful status, Martinez was now eligible, under Iowa law, to obtain an Iowa driver’s license in her own name. In March 2014, she applied for a license in her own name, using her newly issued social security card.
The Iowa Department of Transportation (IDOT), apparently using facial recognition software, noted a similarity between her photograph taken in 2014 and earlier photographs taken when she obtained her driver’s license in 2003 and 2008. As a result, IDOT commenced an investigation.
According to the notes of the IDOT investigator, a woman appeared at the Iowa City drivers’ license station on May 2, 2003, with a California birth certificate in the name of Diana Castaneda. She presented- two rent receipts as proof of residency in West Liberty. On October 28, 2008, a woman appeared at the Iowa City drivers’ license station and applied -for an Iowa ID using the name of Diana Castaneda.
On March 6, 2014, a woman appeared at the Iowa City drivers’ license station and applied for an Iowa driver’s license. The person presented an ID and employment authorization card in the name of Martha Martinez. The photograph of Martinez, however, appéared to match the photograph of Diana Castaneda from March 2, 2003, and October 28, 2008.
The investigator determined that wages were being obtained by Diana Castaneda at Packer Sanitation. The investigator contacted Packer Sanitation and obtained Diana Castaneda’s 1-9, copies of her Iowa ID, social security card, and payroll history showing she obtained wages in excess of $1000. The investigator contacted immigration authorities and learned that Martinez had a valid employment authorization card.
The investigator contacted Martinez by phone. Martinez admitted she had obtained the false IDs in 2003 and 2008. She told the investigator she came to the United States as a child and now had three children and was pregnant with a fourth child. She borrowed a birth certificate in the name of Diana Castaneda but did not know her. She had been recently working but had quit due to her pregnancy. She admitted prior employment under the *742 name and social security number of Diana Castaneda. The investigator informed Martinez that he would recommend she be charged with identity theft. The investigator thanked Martinez for being honest and cooperative.
B. Iowa Criminal Proceedings.
The State filed two criminal charges against Martinez. Count I alleged the crime of identity theft under Iowa Code section 715A.8 (2013). This Code provision states, “A person commits the offense of identity theft if the person fraudulently uses or attempts to fraudulently use identification information of another person, with the intent to obtain credit, property, services, or other benefit.” Iowa Code § 715A.8(2). If the value of the credit, property, or services exceeds one thousand dollars, the person commits a class “D” felony. Id. § 715A.8(3). If the value of the credit, property, or services does not exceed one thousand dollars, the person commits an aggravated misdemeanor. Id. According to the minutes of testimony, the basis for the intent to obtain “credit, property, or services” was employment at Packer Sanitation earning wages in excess of $1000.
Count II alleged the crime of forgery under Iowa Code section 715A.2(1). This Code provision declares that a person is guilty of the crime of forgery if, with intent to defraud or injure anyone, a person “[mjakes, completes, executes, authenticates, issues, or transfers a writing so that it purports to be the act of another who did not authorize that act.” Id. § 715A.2(1)(6). The provision further provides that forgery is a class “D” felony if the writing is or purports to be “[a] document prescribed by statute, rule, or regulation for entry into or as evidence of authorized stay or employment in the United States.” Id. § 715A.2(2)(a)(4).
Martinez filed a motion to dismiss. Citing Arizona v. United States, Martinez argued that federal law preempted her prosecution under the Iowa identity theft and forgery statutes, both on their face and as applied. 567 U.S. 387, 415-16, 132 S.Ct. 2492, 2510, 183 L.Ed.2d 351 (2012). The State resisted. The State distinguished Arizona, noting that in that case, the Arizona statute specifically criminalized failure to comply with federal alien registration requirements while the statutes under which Martinez was charged are independent of federal law.
The district court denied the motion to dismiss. According to the court, the charges of identity theft and forgery were “state crimes independent of Defendant’s immigration status.” In prosecuting Martinez, the court stated, the State was not acting to enforce or attack federal immigration law. Therefore, Martinez’s prosecution was not preempted by federal law.
Martinez sought interlocutory review. We granted the application.
II. Discussion.
A. Overview of Federal Immigration Law Related to Unauthorized Employment of Illegal Aliens.
1. Introduction. “The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens.” Id. at 394, 132 S.Ct. at 2498. This broad authority is in part based upon the federal government’s power to “establish a[ ] uniform Rule of Naturalization.” Id. (quoting U.S. Const, art. I, § 8, cl. 4). It is also based upon the federal government’s inherent power as a sovereign to control and conduct relations with foreign governments. Id. As demonstrated by an amicus brief in Arizona filed by sixteen nations, immigration policy can affect trade, investment, *743 tourism, and diplomatic relations for the entire Nation as well as the perceptions and expectations of aliens on this country who seek full protection of its law. See Mot. of Argentina, Bolivia, Brazil, Chile, Colombia, Costa Rica, Dominican Republic, Ecuador, El Salvador, Guatemala, Honduras, Nicaragua, Panama, Paraguay, Peru and Uruguay for Leave to Join the United Mexican States as Amici Curiae in Supp. of Resp’t at 6, Arizona, 567 U.S. 387, 132 S.Ct. 2492, 2499-2500 (2012). Current national and international debate regarding building a wall on our southern border and the circumstances under which noncitizens from other nations may enter the United States, along with discussions about who should pay for the wall, has an impact on domestic immigration and international relations.
2. Early regulation and plenary authority. The United States Supreme Court has observed that the supremacy of national power in the general field of foreign affairs—including immigration, naturalization, and deportation—is made clear by the United States Constitution. Hines v. Davidowitz, 312 U.S. 52, 62, 61 S.Ct. 399, 401-02, 85 L.Ed. 581 (1941). Yet, until 1891, no comprehensive immigration legislation existed, and a number of states enacted discriminatory legislation. See Kevin J. Fandl, Putting States Out of the Immigration Law Enforcement Business, 9 Harv. L. & Pol’y Rev. 529, 530-31 (2015) [hereinafter Fandl]. Responding to discriminatory legislation against Chinese aliens, the United States Supreme Court in Chy Lung v. Freeman, 92 U.S. 275, 280, 23 L.Ed. 550 (1875), and Fong Yue Ting v. United States, 149 U.S. 698, 707, 13 S.Ct. 1016, 1019, 37 L.Ed. 905 (1893), emphasized the need for “absolute and unqualified” power to deport aliens in the interest of national sovereignty. Fandl, 9 Harv. L. & Pol’y Rev. at 531-32 (quoting Fong Yue Ting, 149 U.S. at 707, 13 S.Ct. at 1019).
3. Overview of Immigration and Nationality Act. Congress exercised its power over immigration through enactment of the Immigration and Nationality Act (INA) which, along with other enactments, provides a “comprehensive federal statutory scheme for regulation of immigration and naturalization” and sets “the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.” Chamber of Commerce of U.S. v. Whiting, 563 U.S. 582, 587, 131 S.Ct. 1968, 1973, 179 L.Ed.2d 1031 (2011) (quoting De Canas v. Bica, 424 U.S. 351, 353, 359, 96 S.Ct. 933, 935, 938, 47 L.Ed.2d 43 (1976), superseded by statute, Immigration Reform and Control Act of 1986, Pub. L. No. 99-603,100 Stat. 3359, as recognized in Chamber of Commerce, 563 U.S. at 590, 131 S.Ct. at 1975); see 8 U.S.C. §§ 1101-1537.
By way of brief summary, the INA provides criteria by which “aliens,” defined as “any person not a citizen or national of the United States,” may enter, visit, and reside in the country. 8 U.S.C. § 1101(a)(3); see Lozano v. City of Hazleton, 620 F.3d 170, 196 (3d Cir. 2010), vacated on other grounds by 563 U.S. 1030, 131 S.Ct. 2958, 180 L.Ed.2d 243 (2011). The INA establishes three categories of aliens: (1) nonimmigrants, (2) immigrants, and (3) refugees and asylees. 8 U.S.C. §§ 1101(a)(15), 1151, 1157-58; see Lozano, 620 F.3d at 196. In order to be legally admitted to the United States, aliens must meet the eligibility criteria of one of these categories. Lozano, 620 F.3d at 196. Certain aliens who have health conditions, have been convicted of certain crimes, present security concerns, or have been recently removed from the United States are inadmissible. 8 U.S.C. § 1182.
Persons in the United States unlawfully are subject to removal, with removal pro *744 ceedings under the INA setting forth the “sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States.” Id. § 1229a(a)(3). INA removal procedures provide for notice, the opportunity to be heard, the opportunity to be represented by counsel, and the possibility of discretionary relief from removal including postponement of removal, cancellation of removal, or even adjustment of status to that of lawful permanent residency. Id. §§ 1229a(c), 1229b.
4. Immigration Reform and Control Act. The INA as originally enacted contained no specific prohibition regarding the employment of aliens which was, as noted by the Supreme Court, at most a “peripheral concern.” De Canas, 424 U.S. at 360, 96 S.Ct. at 939. That changed, however, with the enactment of the Immigration Reform and Control Act (IRCA) in 1986. Arizona, 567 U.S. at 404-05, 132 S.Ct. at 2504; see 8 U.S.C. §§ 1324a-1324b. The IRCA established “a comprehensive framework for ‘combating the employment of illegal aliens.”’ Arizona, 567 U.S. at 404, 132 S.Ct. at 2504 (quoting Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 147, 122 S.Ct. 1275, 1282, 152 L.Ed.2d 271 (2002)). Under the IRCA, Congress declared it unlawful to knowingly hire or continue to employ an unauthorized alien without complying with the work authorization verification system created by the statute. 8 U.S.C. § 1324a(a)(1)-(2).
In order to verify work authorization, the employer must attest under penalty of perjury that an employee is not an unauthorized alien by physically examining documents such as a passport, permanent resident card, driver’s license, or other comparable document, and confirm that those documents reasonably appear to be genuine. Id. § 1324a(b)(1)(A)-(D). On the form known as the 1-9, employees must also make an attestation of their authorized work status. Id. § 1324a(b)(2).
With respect to the 1-9, Congress has provided that “any information contained in or appended to such form, may not be used for purposes other than for enforcement of’ the INA and enumerated federal laws regarding false statements, identification-document fraud, fraud in the federal employment verification system, and perjury. Id. § 1324a(b)(5). As noted by the United States Supreme Court in Arizona, “Congress has made clear ... that any information employees submit to indicate their work status ‘may not be used’ for purposes other than prosecution under specified federal criminal statutes.” Arizona, 567 U.S. at 405, 132 S.Ct. at 2504 (emphasis added) (quoting 8 U.S.C. § 1324a(b)(5)).
Federal employment authorization verification requirements are enforced “through criminal penalties and an escalating series of civil penalties tied to the number of times an employer has violated the provisions.” Id.; see 8 U.S.C. § 1324a(e)-(f). Congress did not authorize criminal penalties for aliens seeking or engaging in unauthorized employment.
Congress authorized imposition of a range of penalties on aliens who commit employment-authorization-related fraud in the IRCA. Congress authorized federal criminal penalties against a person who knowingly uses a document not lawfully issued to the person, a false document, or a false attestation “for the purpose of satisfying a requirement” of the federal employment verification system. 18 U.S.C. § 1546(b). Violators of this criminal provision may be sentenced for up to five years in prison. Id. Congress also authorized federal criminal penalties against a person who uses or possesses an immigration doc *745 ument, including one that demonstrates federal work authorization, “knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured ... by fraud or unlawfully obtained.” Id. § 1546(a). Persons convicted under this statute, in most cases, may be imprisoned for up to ten years. Id. In addition to the criminal penalties, Congress authorized civil penalties for document fraud involving immigration requirements, include the work authorization requirement. 8 U.S.C. § 1324c(a)(1)-(4), (d)(3).
Finally, Congress authorized immigration penalties for persons involved in document fraud. For example, Congress authorized removal of persons convicted of federal criminal document fraud. Id. § 1227(a)(3)(B)—(C); id. § 1324c; 18 U.S.C. § 1546. Further, federal law may preclude aliens from becoming a lawful permanent resident if the alien was employed while he was an “unauthorized alien.” 8 U.S.C. § 1255(c)(2).
5.Illegal Immigration Reform and Immigrant Responsibility Act, In 1996, Congress amended the INA by enacting the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009 (codified as amended in various sections of 8 U.S.C.). The IIRIRA called for improvements in the employer verification system and required that the Attorney General and later the Director of Homeland Security to develop pilot programs designed to improve employment eligibility confirmation process. See Lozano, 620 F.3d at 200. Ultimately, only one of the pilot programs, E-Verify, was reauthorized and expanded to all fifty states. Id. The use of E-Verify rather than the ordinary 1-9 process remains voluntaiy, with a few exceptions. Id.
The IIRIRA authorized the Department of Homeland Security to enter into agreements with state and local law enforce-
ment agencies to enforce federal immigration law. 8 U.S.C. § 1357(g). Under this provision, state and local governments may assist federal enforcement if (1) there is a written agreement, (2) local cooperating authorities receive appropriate training, and (3) local authorities operate under the supervision of federal immigration officials. Id.
6. Federal penalties for immigration document fraud. The various federal statutes establish a wide range of penalties for document fraud related to immigration. Document fraud in immigration matters is prohibited and subject to an administrative enforcement regime. Id. § 1324c. Criminal penalties for fraud and misuse of visas, permits, and other documents are provided in 18 U.S.C. § 1546. In addition, the Identity Theft Penalty Enhancement Act imposes more severe consequences on those who use social security numbers, credit card accounts, or other information in connection with a felony, including violation of immigration law. 18 U.S.C. § 1028A. However, Congress exempted false use of social security numbers for work in certain situations from claims of fraud under the Social Security Act. 42 U.S.C. § 408(e).
7. Discretion in enforcement of immigration laws. Under federal immigration laws, discretion is vested in federal officials in two ways. Federal immigration law is replete with statutory provisions explicitly vesting discretion in the executive branch. See, e.g., Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483-84, 119 S.Ct. 936, 943, 142 L.Ed.2d 940 (1999) (stating in “the initiation or prosecution of various stages in the deportation process ... [a]t each stage the Executive has discretion to abandon the endeavor”).
Congress has also delegated to the executive branch the determination of when a noncitizen may work. 8 U.S.C. § 1324a(h)(3) (removing from definition of *746 “unauthorized alien” those who the Attorney General authorized to be employed even when they are not lawfully admitted for permanent residence). The implementing regulations provide that an alien without lawful status may still be granted work authorization when the administrative convenience gives cases lower priority and an alien establishes economic necessity. 8 C.F.R. § 274a.12(c)(14) (2016).
Further, the United States Supreme Court has “recognized on several occasions over many years that an agency’s decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency’s absolute discretion.” Heckler v. Chaney, 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). In exercising discretion, the United States Supreme Court has recognized that the executive engages in the “balancing of a number of factors which are peculiarly within its expertise.” Id. As a result, the cases generally recognize that immigration laws vest substantial discretion in the executive branch with respect to enforcement. See Ariz. Dream Act Coal. v. Brewer, 855 F.3d 957, 967 (9th Cir. 2017), petition for cert. filed, 85 U.S.L.W. 3471, (U.S. Mar. 29, 2017) (No. 16-1180).
B. Implementation of Supremacy Clause Through Principles of Preemption.
Under the Supremacy Clause of the United States Constitution, “the Laws of the United States ... shall be the supreme Law of the Land ... any Thing in the ... Laws of any State to the Contrary notwithstanding.” U.S. Const. art. VI, cl. 2. Since the days of John Marshall, the Supremacy Clause has been interpreted to mean that even if a state statute is enacted in the execution of acknowledged state powers, state laws that “interfere with, or are contrary to the laws of Congress” must yield to federal law. Gibbons v. Ogden, 22 U.S. 9 Wheat. 1, 211, 6 L.Ed. 23 (1824). The United States Supreme Court has implemented the Supremacy Clause through the development of its preemption doctrine. Fid. Fed. Sav. & Loan Ass’n v. de la Cuesta, 458 U.S. 141, 152, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982).
The contours of the doctrine of preemption, if sometimes difficult to apply, are well established. The United States Supreme Court has developed two broad categories of preemption of state law: express and implied. Id. at 152-53, 102 S.Ct. at 3022. Express preemption occurs when the federal statutory text clearly provides that congressional authority is exclusive. Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). When express preemption is implicated, close examination of statutory language is ordinarily required to implement congressional intent. CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993).
In addition, the Supreme Court has recognized two types of implied preemption—field preemption and conflict preemption—which arise even when there is no express provision in the federal statute preempting local law. Oneok, Inc. v. Learjet, Inc., 575 U.S. -, -, 135 S.Ct. 1591, 1595, 191 L.Ed.2d 511 (2015). Field preemption arises when Congress has enacted a comprehensive scheme. Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm’n, 461 U.S. 190, 203-04, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). In these cases, congressional intent to preempt can be inferred from a framework of regulation “so pervasive ... that Congress left no room for the States to supplement it” or where there is a “federal interest ... so dominant that the federal system will be assumed to preclude en *747 forcement of state laws on the same subject.” Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).
Conflict preemption occurs when a state law conflicts with a federal provision. Wis. Pub. Intervenor v. Mortier, 501 U.S. 597, 605, 111 S.Ct. 2476, 2482, 115 L.Ed.2d 532 (1991). There are two variations of conflict preemption. Conflict preemption occurs when “compliance with both federal and state regulation is a physical impossibility.” Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). Conflict preemption also is imminent whenever two separate remedies are brought to bear on the same activity. Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc., 475 U.S. 282, 286, 106 S.Ct. 1057, 1061, 89 L.Ed.2d 223 (1986).
Conflict preemption also occurs when a state law is an obstacle to the accomplishment of a federal purpose. Hines, 312 U.S. at 66-67, 61 S.Ct. at 404. In this regard, the United States Supreme Court has said, “What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects.” Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 373, 120 S.Ct. 2288, 2294, 147 L.Ed.2d 352 (2000).
C. Application of Preemption Principles to Immigration Law.
1. Overview of United States Supreme Court preemption precedent in immigration cases. In Hines, the United States Supreme Court considered the validity of a Pennsylvania alien registration statute. 312 U.S. at 59, 61 S.Ct. at 400. A year earlier, Congress had enacted a Federal Alien Registration Act. Id. at 60, 61 S.Ct. at 400. The Hines Court noted that “the regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the state also acts on the same subject, ‘the act of [C]ongress ... is supreme.’ ” Id. at 66, 61 S.Ct. at 403-04 (quoting Gibbons, 22 U.S. at 211). The Hines Court canvassed the various approaches to preemption, noting that none of the formulations or expressions “provides an infallible constitutional test or an exclusive constitutional yardstick.” Id. at 67, 61 S.Ct. at 404. And while the federal law did not have an express preemption provision, the Hines Court concluded that the Pennsylvania law “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Id.
A more recent immigration case dealing with federal preemption is De Canas, 424 U.S. 351, 96 S.Ct. 933. In De Canas, the Supreme Court considered whether federal law prohibited California from enacting a statute which forbade an employer from knowingly employing an alien who was not entitled to lawful residence in the United States if such employment would have adverse effect on lawful resident workers. Id. at 352-53, 96 S.Ct. at 935. A California appellate court held that the statute was unconstitutional, noting that “in the area of immigration and naturalization, congressional power is exclusive.” De Canas v. Bica, 40 Cal.App.3d 976, 115 Cal.Rptr. 444, 446 (1974). The California court further held that state regulatory power was foreclosed when Congress “as an incident of national sovereignty” enacted the INA as a comprehensive scheme- governing all aspects of immigration and naturalization, including the employment of aliens and specifically declined to adopt sanctions on employers. Id.
The De Canas Court held that the California statute was not preempted by the INA. 424 U.S. at 365, 96 S.Ct. at 941. The Court concluded preemption could not be *748 required because “the nature of the regulated subject matter permits no other conclusion” nor because “Congress has unmistakably so ordained.” Id. at 356, 96 S.Ct. at 937 (quoting Fla. Lime, 373 U.S. at 142, 83 S.Ct. at 1217). The Court was unwilling to presume that in enacting the INA, Congress intended to oust state authority to regulate the employment of immigrants in a manner consistent with federal law. Id. at 357, 96 S.Ct. at 937. The Court declined to consider whether the California statute was “an obstacle to the. accomplishment and execution of the full purposes and objectives of Congress” because the issue was not addressed below. Id. at 363, 96 S.Ct. at 940 (quoting Hines, 312 U.S. at 67, 61 S.Ct. at 404). In light of the vibrancy of obstacle preemption in immigration law, De Canas thus was a limited precedent from the outset.
In Hoffman Plastic, the United States Supreme Court considered whether an unauthorized immigrant could receive back pay when the individual was unlawfully terminated in retaliation for participating in collective bargaining. 535 U.S. at 140, 122 S.Ct. at 1278. In a battle between federal agencies, the Supreme Court held that a National Labor Relations Board remedy for an illegal alien would “unduly trench” upon the IRCA. Id. at 151, 122 S.Ct. at 1284. Although not a preemption case, Hoffman Plastic declared that “combating the employment of illegal aliens ... [is] central to ‘[t]he policy of immigration law.’ ” Id. at 140, 122 S.Ct. at 1278 (quoting INS v. Nat’l Ctr. for Immigrants’ Rights, Inc., 502 U.S. 183, 194 n.8, 112 S.Ct. 551, 558 n.8, 116 L.Ed.2d 546 (1991)).
The most recent and most important United States Supreme Court case involving preemption in the context of immigration and employment is Chamber of Commerce, 563 U.S. 582, 131 S.Ct. 1968. In Chamber of Commerce, the Court considered a challenge to an Arizona law which allowed for the suspension and revocation of business licenses for employing illegal aliens and required all employers to verify the employment status of all employees using an internet-based system, E-Verify. Id. at 587, 131 S.Ct. at 1973. Unlike De Canas, which involved a preemption claim under the INA, the Chamber of Commerce case involved preemption under the IRCA. Id. at 588-89, 131 S.Ct. at 1974. The Chamber of Commerce Court ruled, however, that the Arizona regulation was within a “savings clause” of the IRCA, which provided that federal immigration law preempts “any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ ... unauthorized aliens.” Id. at 590, 611, 131 S.Ct. at 1975, 1987 (quoting 8 U.S.C. § 1324a(h)(2)).
The last case is Arizona, 567 U.S. 387, 132 S.Ct. 2492. In Arizona, the United States challenged four provisions of an Arizona statute dubbed the Support Our Law Enforcement and Safe Neighbor’s Act. Id. at 393, 132 S.Ct. at 2497. Two of the challenged provisions created new criminal offenses. Id. One relevant provision made failure to comply with alien registration requirements a state misdemeanor. Id. Another provision made it a misdemeanor for an unauthorized alien to seek or engage in work in the state. Id. at 393-94, 132 S.Ct. at 2497-98. Two other provisions gave arrest authority and investigative duties with respect to certain aliens to state and local law enforcement. Id. at 394-95, 132 S.Ct. at 2498.
Justice Kennedy delivered the opinion of the Court. Id. at 392, 132 S.Ct. at 2497. Justice Kennedy began with a review of the broad scope of federal immigration policy. Id. at 394-97, 132 S.Ct. at 2498-99. Noting the impact of immigration policy on international relations, Justice Kennedy *749 stressed that the federal governance of immigration status is “extensive and complex.” Id. at 395, 132 S.Ct. at 2499. After canvassing the broad sweep of immigration provisions, Justice Kennedy emphasized that “[a] principal feature of the removal system is the broad discretion exercised by immigration officials.” Id. Justice Kennedy explained,
Discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service.

Id.

Justice Kennedy recognized, however, that states bear “many of the consequences of unlawful immigration.” Id. at 397, 132 S.Ct. at 2500. Justice Kennedy cited statistics indicating that hundreds of thousands of deportable aliens are captured in Arizona each year. Id. Further, Justice Kennedy acknowledged studies reporting that aliens are responsible for a disproportionate share of serious crime. Id.
After surveying traditional categories of federal preemption, Justice Kennedy proceeded to evaluate each of the challenged provisions of Arizona law. Id. at 397-400, 132 S.Ct. at 2500-01. The first provision considered provided a state criminal penalty for failure to complete or carry an alien registration document in -violation of federal law. Id. at 399-400, 132 S.Ct. at 2501. Justice Kennedy wrote that although the statute was not identical to that considered in Hines, federal immigration law provides “a full set of standards governing alien registration, including the punishment for noncompliance. It was designed as a ‘harmonious whole.’ ” Id. at 401, 132 S.Ct. at 2502 (quoting Hines, 312 U.S. at 72, 61 S.Ct. at 407).
According to Justice Kennedy, field preemption foreclosed state regulation even if the state regulation is parallel to federal standards. Id. Justice Kennedy emphasized permitting Arizona to impose its own penalties for the federal offenses would conflict with the careful framework Congress adopted. Id. If the provision of state law were enforced, Arizona would “have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies.” Id. at 402, 132 S.Ct. at 2503. Further, Justice Kennedy noted that the penalties for violation of the Arizona law ruled out probation as a possible sentence and eliminated the possibility of a pardon, thus conflicting with the plan that Congress put in place. Id.
Justice Kennedy next turned to the provision of Arizona law which made it a state misdemeanor for “an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor.” Id. (quoting Ariz. Rev. Stat. Ann. § 13-2928(c) (West Supp. 2011)). This Arizona statutory provision had no counterpart in federal law. Id. The United States claimed the provision upset “the balance struck by the [IRCA] and must be preempted as an obstacle to the federal plan of regulation and control.” Id.
Justice Kennedy recognized that in De Canas, the Court had held the federal government had expressed no more than “a peripheral concern with [the] employment of illegal entrants.” Id. (alteration in original) (quoting De Canas, 424 U.S. at *750 360, 96 S.Ct. at 939). But Justice Kennedy-noted that in light of the enactment of the IRCA, “[c]urrent federal law is substantially different from the regime that prevailed when De Canas was decided.” Id. at 404, 132 S.Ct. at 2504. Justice Kennedy noted that IRCA now created “a comprehensive framework” for “combating the employment of illegal aliens.” Id. (quoting Hoffman Plastic, 535 U.S. at 147, 122 S.Ct. at 1282).
In analyzing the comprehensive framework of IRCA, Justice Kennedy stressed that it did not impose criminal sanctions on the employee when aliens sought or engaged in unauthorized work. Id. While Justice Kennedy recognized federal law made it a crime for unauthorized workers to obtain employment through fraudulent means, Congress made it clear that any information employees submitted to indicate their work status could not be used for purposes other than “prosecution under specified federal criminal statutes for fraud, perjury, and related conduct,” Id.; see 8 U.S.C. § 1324a(b)(5), (d)(2)(F)-(G).
Justice Kennedy recognized the express exemption provision of IRCA was silent about whether additional penalties could be imposed against employees seeking to engage in unauthorized work. Id. But Justice Kennedy emphasized that “the existence of an ‘express preemption provisio[n] does not bar the ordinary working of conflict preemption principles’ or impose a ‘special burden’ that would make it more difficult to establish the preemption of laws falling outside the clause.” Arizona, 567 U.S. at 406, 132 S.Ct. at 2504-05 (quoting Geier v. Am. Honda Motor Co., 529 U.S. 861, 869-70, 120 S.Ct. 1913, 1919-20, 146 L.Ed.2d 914 (2000)).
Justice Kennedy continued that the “Arizona law would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens.” Id. at 406, 132 S.Ct. at 2505. Although the goals and methods of Arizona law to achieve deterrence were the same as federal law, Justice Kennedy observed, the conflict is in “the method of enforcement” and that “[cjonflict in technique can be fully as disruptive to the system Congress enacted as conflict in overt policy.” Id. (quoting Amalgamated Ass’n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge, 403 U.S. 274, 287, 91 S.Ct. 1909, 1918, 29 L.Ed.2d 473 (1971)).
Justice Kennedy next examined the third challenged provision of Arizona law which provided that a state officer, “without a warrant, may arrest a person if the officer has probable cause to believe ... [the person] has committed any public offense that makes [him] removable from the United States.” Id. (quoting Ariz. Rev. Stat. Ann. § 13-3883(A)(5)). After canvassing federal law related to removal, Justice Kennedy observed the Arizona statute gave state officers even greater authority to arrest aliens on the basis of possible removability than Congress gave to trained federal immigration officers. Id. at 408-09, 132 S.Ct. at 2506. The state authority could be exercised without any input from the federal government regarding whether an arrest is warranted in a particular case. Id. This, according to Justice Kennedy, “would allow the State to achieve its own immigration policy.” Id.
Justice Kennedy further reasoned that allowing state authorities to determine whether an alien should be detained for being removable violates the principle that “the removal process is entrusted to the discretion of the Federal Government.” Id. Authorizing state and local officials to interfere with this discretion “creates an obstacle to the full purposes and objectives of Congress.” Id. at 410, 132 S.Ct. at 2507.
Finally, Justice Kennedy turned to the fourth challenged provision of Arizona law. *751 Id. This fourth challenged provision required state officers to make a “reasonable attempt” to determine the immigration status of any person they stop or arrest if “reasonable suspicion exists that the person is an alien and is unlawfully present in the United States.” Id. (quoting Ariz. Rev. Stat. Ann. § 11-1051(B)). Further, the law provided that the immigration status of any person arrested would be determined before release. Id. Ordinarily, checking the immigration status of a detained person involved a contact to Immigration and Customs Enforcement (ICE), which keeps a database of immigration records. Id.
The Court upheld this provision of Arizona law against preemption attack. Id. at 416, 132 S.Ct. at 2510. Justice Kennedy noted that cooperation between federal and state officials is an important part of the immigration system. Id. at 411, 132 S.Ct. at 2508. Further, Congress required ICE to respond to requests for verification from state officials. Id.
Justice Kennedy closed his opinion with a melodious endorsement of the beneficial aspects of immigration. Id. at 415-16, 132 S.Ct. at 2510. He cited an immigration ceremony at the Smithsonian involving a dozen immigrants who stood before the tattered flag that inspired the national anthem. Id. He noted the history of the United States “is in part made of the stories, talents, and lasting contributions of those who crossed oceans and deserts to come here.” Id.
2. Application of preemption principles to immigration law by lower federal courts. After Arizona, lower federal courts have grappled with federal preemption questions involving immigrants and employment. The closest precedent to the case before us arises from the state of Arizona.
In Puente Arizona v. Arpaio, plaintiffs attacked two Arizona statutes which criminalized the act of identity theft done with intent to obtain or continue employment. 76 F.Supp.3d 833, 842 (D. Ariz. 2015), rev’d in part and vacated in part, 821 F.3d 1098 (9th Cir. 2016). The challenged Arizona aggravated identity theft statute provided that “[a] person commits aggravated taking the identity of another person ... if the person knowingly takes ... or uses any personal identifying information ... of ... [a]nother person, including a real or fictitious person, with the intent to obtain employment.” Id. at 844 (quoting Ariz. Rev. Stat. Ann. § 13-2009). Another Arizona statute provided that a person commits identity theft by taking, purchasing, manufacturing, recording, possessing, or using personal identifying information with the intent to engage in an unlawful purpose or to cause economic loss, or “with the intent to obtain or continue employment.” Id. at 844-45.
The district court granted a preliminary injunction against enforcement of the statutes on preemption grounds. Id. at 869. The court recognized that the statutes were facially neutral and applied to immigrants and nonimmigrants alike. Id. at 854. The court noted that a state law may not “frustrate the operation of federal law [even if] the state legislature in passing its law had some purpose in mind other than one of frustration.” Id. at 855 (alteration in original) (quoting Perez v. Campbell, 402 U.S. 637, 651-52, 91 S.Ct. 1704, 1712, 29 L.Ed.2d 233 (1971)). In any event, based on legislative history and common sense, the court determined that a primary purpose and effect of the statutes was to impose criminal penalties on unauthorized aliens who sought or engaged in unauthorized employment. Id.
Turning to preemption analysis, the district court reasoned that in Arizona, the Supreme Court did not conclude Congress had occupied the field of “unauthorized- *752 alien employment.” Id. at 856. Instead, the district court stated the high court applied conflict preemption principles in striking down an Arizona law that made it a crime for unauthorized aliens to seek employment. Id.
But in this case, the district court noted, the plaintiffs identified a narrower field, namely, “unauthorized-alien fraud in seeking employment.” Id. This narrower field, according to the court, “ha[d] been heavily and comprehensively regulated by Congress,” Id. The court cited extensive regulations in the IRCA, emphasizing that Congress imposed every kind of penalty that can arise from unauthorized alien use of false document to secure employment— criminal, civil, immigration—and had expressly limited states use of federal employment verification documents. Id. 857; see 8 U.S.C. § 1324a(b)(5), (d)(2)(F)(G).
The district court turned to conflict preemption. Puente Ariz., 76 F.Supp.3d at 857. The court noted that in considering conflict preemption, direct conflict between federal law and state law is not required. Id. According to the court, even when state and federal laws have the same general objective, an “inconsistency of sanctions” between two laws may “undermine[] the congressional calibration of force.” Id. (quoting Crosby, 530 U.S. at 380, 120 S.Ct. at 2298). The district court noted that under the Arizona identity theft law, only a criminal sanction was available. Id. at 858. In contrast, federal authorities had a range of options, including civil penalties. Id.
The district court concluded the overlapping penalties created by the Arizona identity theft statutes which “layer additional penalties atop federal law” likely result in preemption. Id. (quoting Ga. Latino All. for Human Rights v. Governor of Ga., 691 F.3d 1250, 1267 (11th Cir. 2012)). Like the United States Supreme Court in Arizona, the district court noted that conflict is imminent whenever “two separate remedies are brought to bear on the same activity.” Id. (quoting Gould Inc., 475 U.S. at 286, 106 S.Ct. at 1061). As a result, the court entered a preliminary injunction prohibiting the enforcement of the identity theft statutes. Id. at 869.
The United States Court of Appeals for the Ninth Circuit reversed the district court in Puente Arizona v. Arpaio, 821 F.3d 1098, 1111 (9th Cir. 2016). The Ninth Circuit reversal, however, was on a narrow ground, namely, that the facially neutral Arizona statutes were not facially preempted. Id. at 1108. The Ninth Circuit came to this conclusion because the statutes did not intrude on federal authority in all its applications, as generally required for a successful facial attack. Id. at 1107-08. The Ninth Circuit expressed no view as to whether the statutes were preempted on an as-applied basis. Id. at 1108.
On remand, the district court considered whether the Arizona statutes were preempted as applied. Puente Arizona v. Arpaio, No. CV-14-01356-PHX-DGC, 2016 WL 6873294, at *1 (D. Ariz. Nov. 22, 2016). The court found that Congress preempted “a relatively narrow field: state prosecution of fraud in the 1-9 process.” Id. at *12. In light of the intruding provisions of state identity theft laws, the court concluded the defendants were preempted under field preemption from using the 1-9 form and accompanying documentation for investigations or prosecutions of violations of the Arizona identity theft and forgery statutes. Id. at *13.
The district court then turned to conflict preemption. Id. The court determined the Arizona identity theft and forgery statutes were not conflict preempted. Id. at *15. The court emphasized that federal law only imposed criminal and civil penalties *753 for fraud committed directly in the 1-9 process, or to satisfy other immigration requirements or receive other immigration benefits. Id. at *13. But, the court reasoned, to the extent state law imposed penalties on fraud committed outside the 1-9 process, the state penalties did not “layer additional consequences on top of federal penalties because the federal penalties [did] not address non-I-9 conduct.” Id. The court found that use of a false name on an employer’s direct deposit payroll form, for example, is not done for an immigration purpose, but rather to obtain the convenience of direct payroll deposits. Id. at *14.
Another case arising out of Arizona dealt with the question of conflict preemption of a state policy refusing to allow DACA recipients to obtain Arizona drivers’ licenses. Ariz. Dream Act Coal. v. Brewer, 757 F.3d 1053, 1057-58 (9th Cir. 2014). In Brewer, the Ninth Circuit considered an appeal of a denial of a preliminary injunction restraining the state from enforcing the statute. Id. at 1058.
The Ninth Circuit reversed and remanded the matter for entry of a preliminary injunction prohibiting the defendants from enforcing its policy. Id. The Brewer court declared that the plaintiffs contention that Arizona’s policy was conflict preempted because of its interference with Congress’s intent that the executive branch possess discretion to determine when citizens work in the United States was plausible. Id. at 1061.
The Brewer court then turned to the impact of Arizona law on federal policy. Id. at 1062. The court reasoned that, as a practical matter, the ability to drive is a virtual necessity for people in Arizona who want to work. Id. The court emphasized it did not matter that the state’s policy did not formally prohibit DACA recipients from working, because preemption analysis must contemplate the practical result of the state law. Id. The court reasoned that if the practical effect of .the Arizona policy “is that DACA recipients in Arizona are generally obstructed from working—despite the Executive’s determination, backed by a delegation of Congressional authority, that DACA recipients throughout the United States may work—then the [state’s] policy is preempted.” Id. at 1063. The court emphasized that state law “is preempted whenever its application would frustrate the objectives and purposes of Congress, even if the state law’s own application is frustrated by individuals’ noncompliance.” Id. On remand, the district court granted a permanent injunction and the state appealed. Ariz. Dream Act Coal. v. Brewer, 81 F.Supp.3d 795, 811 (D. Ariz. 2015). The Ninth Circuit affirmed. Ariz. Dream Act Coal. v. Brewer, 818 F.3d 901, 920, amended by 855 F.3d 957.
Another case involving identity fraud is United States v. South Carolina, 720 F.3d 518 (4th Cir. 2013). In South Carolina, the Fourth Circuit considered the validity of a state statute making it unlawful for any person to display or possess a false or counterfeit ID for “purpose[s] of proving lawful presence in the United States.” Id. at 522. The state argued that' a presumption against preemption applied because “fraud is an area traditionally for state legislation.” Id. at 522. The Fourth Circuit, however, noted that when the fraud at issue involved federal immigration documents, the presumption against preemption did not apply. Id. The Fourth Circuit further stressed,
As with other immigration-related measures, prosecution for counterfeiting or using federal immigration documents is at the discretion of the Department of Justice acting through the United States Attorney, and allowing the state to prosecute individuals for' violations of a state *754 law that is highly similar to a federal law strips federal officials of that discretion.
Id. at 532-33. Concluding that Congress had occupied the field, the Fourth Circuit noted that because enforcement of federal antifraud statutes involved the discretion of federal officials, a state’s own law in the area, inviting state prosecutions, would “stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Id. (quoting Hines, 312 U.S. at 67, 61 S.Ct. at 404).
3. Summary of general principles of preemption in the field of modem immigration law. There are two general dis-cernable trends in the field of immigration. First, over time, federal regulation of immigration has become increasingly detailed and complex. Second, as noted by one legal expert, the trend in court decisions reflects recognition of broad federal control over nearly the entire field of immigration. Fandl, 9 Harv. L. & Pol’y Rev. at 532.
The expansive scope of federal preemption doctrine in the immigration field recognizes, among other things, the role of discretionary enforcement. Discretion has been baked into the cake of immigration law for many years through congressional enactment and caselaw. State law regulatory schemes that interfere with the systematic implementation of federal enforcement discretion present an obstacle in one of the main purposes of federal immigration policy: to speak with one voice on immigration matters. For this reason, state mirror-image enforcement of federal immigration law was soundly rejected in Arizona, 567 U.S. at 410, 132 S.Ct. at 2507.
Finally, through the enactment of 8 U.S.C. § 1357(g), Congress has demonstrated an ability to identify areas of potential federal-state cooperation in the enforcement of immigration law. Notably, however, such federal-state cooperation
must be subject to written agreements, involve training of state officials, and be conducted under the supervision of federal authorities. 8 U.S.C. § 1357(g)(1). Even where federal-state cooperation has been expressly authorized, Congress has insisted on substantial federal control of the underlying activities.
D. Application of Preemption Principles to Iowa’s Forgery Statute.
Iowa Code section 715A.2(2)(a.)(4) is preempted on its face by federal immigration law. The statute provides that forgery arises if the writing is or purports to be “[a] document prescribed by statute, rule, or regulation for entry into or as evidence of authorized stay or employment in the United States.” Iowa Code § 715A.2(2)(a)(4). This statutory provision is the mirror image of federal immigration law, namely 18 U.S.C. § 1546(a).
Such mirror-image statutes are preempted by federal law. As noted in Arizona when the Supreme Court considered state law imposing penalties for federal alien registration violations, “[permitting the State to impose its own penalties ... would conflict with the careful framework Congress adopted.” Arizona, 567 U.S. at 402, 132 S.Ct. at 2502. Further, it would impermissibly divest “federal authorities of the exclusive power to prosecute these crimes.” Valle del Sol Inc. v. Whiting, 732 F.3d 1006, 1027 (9th Cir. 2013); see Ga. Latino All., 691 F.3d at 1267 (finding a Georgia statute, which “layer[ed] additional penalties atop federal [immigration] law,” preempted). As noted by the United States Supreme Court, under such mirror-image enforcement “the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution *755 would frustrate federal policies.” Arizona, 567 U.S. at 402, 132 S.Ct. at 2503.
E. Application of Preemption Principles to Prosecution of Martinez Under Iowa’s Identity Theft Statute.
1. Facial preemption. Unlike Iowa Code section 715A.2(2)(a)(4), Iowa’s identity theft statute, Iowa Code section 715A.8, does not directly track the language of federal immigration law. Because the identity theft statute has a potentially broader application outside the immigration context, it is not facially preempted by federal immigration law. An unauthorized alien who committed identity theft outside the field occupied by federal immigration law could be prosecuted under state law. For example, identity theft to defraud a bank by an unauthorized alien would not be preempted by federal immigration law and prosecution of an alien for such a crime would be well within the traditional police power of the states. Further, many persons may be prosecuted under the statute who are not aliens but are United States citizens. While enforcement of identity theft may be preempted by federal immigration law in some contexts, it is only preempted to the extent it intrudes upon, interferes, or is an obstacle to the implementation of federal immigration law. See Puente Ariz., 821 F.3d at 1106.
2. Field preemption as applied to Martinez. While the identity theft statute is not preempted in all its applications, that is not the end of the analysis. As noted in Gade v. National Solid Waste Management Association, a statute “is not saved from pre-emption simply because the State can demonstrate some additional effect outside of the [preempted area].” 505 U.S. 88, 107, 112 S.Ct. 2374, 2388, 120 L.Ed.2d 73 (1992). The notion a statute may be preempted in some of its applications was recognized by the United States Supreme Court in Hillman v. Maretta, 569 U.S. -, 133 S.Ct. 1943, 186 L.Ed.2d 43 (2013). In Hillman, the Court held that a particular Virginia statute would be preempted only as applied to federal employees. Id. at -, 133 S.Ct. at 1955. The notion that state statutes may be preempted as applied has been utilized in the immigration law context. See Brewer, 757 F.3d at 1062.
We now turn to the question of whether the statute is field preempted as applied in this case. Here, the only factual basis for the State’s charge that Martinez used false identity documents “to obtain credit, property, and services”—an essential element in the crime of identity theft—is the allegation that Martinez obtained unauthorized employment.
The Iowa identity theft statute is preempted to the extent it regulates fraud committed to allow an unauthorized alien to work in the United States in violation of federal immigration law. The IRCA is a comprehensive statute that brought regulation of alien employment under the umbrella of federal immigration policy. See Hoffman Plastic, 535 U.S. at 147, 122 S.Ct. at 1282. Under its comprehensive scheme, Congress made employers primarily responsible for preventing unauthorized aliens from obtaining employment.
To the extent federal immigration authorities choose to proceed with sanctions against unauthorized aliens, the IRCA establishes a comprehensive regime of criminal, civil, and immigration related consequences. See, e.g., 8 U.S.C. § 1324c; 18 U.S.C. § 1546. These multiple sanctions establish a system that can work as a “harmonious whole.” Valle del Sol, 732 F.3d at 1025. Because the federal immigration law occupies the field regarding the employment of unauthorized aliens, the State in this case cannot prosecute Mar *756 tinez for identity theft related to false documentation supplied to her employer as an unauthorized alien. She may, of course, be subject to prosecution under 8 U.S.C. § 1324c and 18 U.S.C. § 1546. Any such prosecution rests in the discretion of federal prosecutors.
The United States Supreme Court’s approach in Arizona supports our analysis. In Arizona, the United States Supreme Court held that the federal plan related to alien registration was “a single integrated and all-embracing system”' designed as a “harmonious whole” • with a “full set of standards ... including punishment for noncompliance.” 567 U.S. at 406-01, 132 S.Ct. at 2501-02 (quoting Hines, 312 U.S. at 72, 74, 61 S.Ct. at 407-08). Here,' the same can be said for the field of unauthorized employment of aliens. Congress has dominated the field and because Congress has “adopted a calibrated framework within the INA to address this issue,” any “state’s attempt to intrude into this area is prohibited.” Ga. Latino All., 691 F.3d at 1264. The federal government occupies the field and “even complementary state regulation is impermissible.” Arizona, 567 U.S. at 401, 132 S.Ct. at 2502.
3. Conflict preemption as applied to Martinez. We also conclude that enforcement of Iowa’s identity theft statute is conflict preempted in this case. Any prosecution under the Iowa identity theft statute frustrates congressional purpose and provides an obstacle to the implementation of federal immigration policy • by usurping federal enforcement discretion in the field of unauthorized employment of aliens. See id. at 399-400, 132 S.Ct. at 2501. As further noted in Arizona, a conflict in technique can be as fully disruptive to the system Congress enacted as conflict in overt policy. Id. at 407, 132 S.Ct. at 2505. A state statute is preempted when it stands “as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Id. (quoting Hines, 312 U.S. at 67, 61 S.Ct. at 404).
Additionally, the full purposes and objectives of Congress in the employment of unlawful immigrants include the establishment of a comprehensive federal system of control with a unified discretionary enforcement regime. As noted in South Carolina, it is the prerogative of federal officials to police work authorization fraud by aliens. 720 F.3d at 533. Federal discretion in the enforcement of immigration law is essential to its implementation as a harmonious whole. The reasons for exercise of federal discretion are varied. Federal officials often rely upon unauthorized aliens to build criminal eases involving drugs or human traffickers. The lisk faced by unauthorized aliens being subject to violations of labor laws by exploiting employers is a discretionary factor to be taken into account by federal officials. Arizona, 567 U.S. at 404-05, 132 S.Ct. at 2504. Enforcement may be affected by foreign affairs or a need to account for reciprocal enforcement in other countries. Id. at 395, 132 S.Ct. at 2498. As Justice Kennedy noted in Arizona, “Discretion in the enforcement of immigration-law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than ... aliens who commit a serious crime.” Id. at 396, 132 S.Ct. at 2499.
Local enforcement of laws regulating employment of unauthorized aliens would result in a patchwork of inconsistent enforcement that would undermine the harmonious whole of national immigration law. This case is a classic demonstration of why preemption is necessary. Federal authorities in this case appear to be willing to defer any potential federal immigration action on equitable and humanitarian grounds. Martinez came to the United *757 States as a child, an illegal entry for which she is not personally responsible. She was educated in Iowa, has no criminal record, is a productive member of the community, and now has four children who are citizens of the United States. Federal immigration authorities routinely take these equitable and humanitarian considerations into account in the enforcement of immigration law. Federal enforcement officials might well weigh the fact that a mother would be separated from her four children who are United States citizens as a very undesirable result.
Further, Martinez stepped forward as part of a federal program, DACA. She provided relevant immigration ’ authorities with information and was granted deferred status. Federal authorities might blanch at prosecuting a person who in good faith responded to their invitation to come out of the shadows for deferred action. See Brewer, 757 F.3d at 1063 (citing the practical effect of Arizona policy being DACA recipients were barred from working).
The state prosecutor in this case, however, seems to have a different philosophy and, as reflected in the charging decision to seek Martinez’s conviction on two felonies, exposed her to a significant Iowa prison term and removal from the country. If such local exercise of prosecutorial discretion were permitted, the harmonious system of federal immigration law related to unauthorized employment would literally be destroyed.
Allowing Iowa to enforce its identity theft statute in the context of the employment of an unauthorized alien conflicts with Congress’s chosen method of enforcement. See Arizona, 567 U.S. at 406-07, 132 S.Ct. at 2505. Federal prosecution of immigration crimes are brought by the appropriate United States Attorney. United States Attorneys exercise their discretion in a manner consistent with the established priorities of the administrations they serve. Ga. Latino All., 691 F.3d at 1265. Although federal law allows state-federal cooperative enforcement by agreement under certain circumstances, there is no applicable agreement here. See 8 U.S.C. § 1357(g)(1). Allowing state prosecutors to pursue identity theft criminal prosecutions in which the crimes are based on unlawful employment by unauthorized aliens would threaten uniform application of immigration law. See Ga. Latino All., 691 F.3d at 1266.
III. Conclusion.
For the above reasons, we reverse the decision of the district court and remand the case for entry of an order of dismissal.
REVERSED AND REMANDED WITH DIRECTIONS.
Cady, C.J., Wiggins and Hecht, JJ., join this opinion. Cady, C.J., files a special concurrence in which Wiggins, J., joins. Wiggins, J., files a separate special concurrence. Mansfield, Waterman, and Zager, JJ,, dissent.

. Memorandum from Janet Napolitano, Sec’y of U.S. Dep’t of Homeland Sec. to David L. Aguilar, Acting Comm'r, U.S. Customs & Border Prot.; Alejandro Mayorkas, Dir., U.S. Citizenship & Immigration Servs.; and John Morton, Dir., U.S. Immigration & Customs Enf't (June 15, 2012), http://www.dhs.gov/xlibrary/ assets/s 1 -exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.