IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,502

STATE OF KANSAS,
*Appellee,*

v.

RAMIRO GARCIA,
*Appellant.*

SYLLABUS BY THE COURT

Defendant's prosecution for identity theft for using another person's Social Security number to obtain employment is expressly preempted by the federal Immigration Reform and Control Act of 1986.

Review of the judgment of the Court of Appeals in an unpublished opinion filed January 29, 2016. Appeal from Johnson District Court; KEVIN P. MORIARTY, judge. Opinion filed September 8, 2017. Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause, and *Evan Freeman*, legal intern, of the same office, was with him on the brief for appellant.

*Jacob M. Gontesky*, assistant district attorney, argued the cause, and *Steven J. Obermeier*, senior deputy district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This companion case to *State v. Morales*, 306 Kan. __, __ P.3d __ (No. 111,904, this day decided), and *State v. Ochoa-Lara*, 306 Kan. __, __ P.3d __ (No.

1

112,322, this day decided), involves defendant Ramiro Garcia's conviction on one count of identity theft.

The State's basis for the charge was Garcia's use of the Social Security number of Felisha Munguia to obtain restaurant employment. A Court of Appeals panel affirmed Garcia's conviction in an unpublished opinion. See *State v. Garcia*, No. 112,502, 2016 WL 368054 (Kan. App. 2016).

We granted Garcia's petition for review on three issues: (1) whether there was sufficient evidence that Garcia acted with an "intent to defraud," an element of identity theft; (2) whether the federal Immigration Reform and Control Act of 1986 (IRCA) preempted the prosecution; and (3) whether it was clearly erroneous for the district court judge not to give a unanimity instruction. Because we decide that Garcia's conviction must be reversed because the State's prosecution based on the Social Security number was expressly preempted, we do not reach Garcia's two other issues.

FACTUAL AND PROCEDURAL HISTORY

On August 26, 2012, Officer Mike Gibson pulled Garcia over for speeding. Gibson asked Garcia where he was going in such a hurry. Garcia replied that he was on his way to work at Bonefish Grill. Based on the results of a routine records check on Garcia, Gibson contacted Detective Justin Russell, who worked in the financial crimes department of the Overland Park Police Department. Russell was in the neighborhood and came to the scene to speak with Garcia.

The day after speaking with Garcia, Russell contacted Bonefish Grill and obtained Garcia's "[e]mployment application documents, possibly the W-2, the I-9 documents." Russell then spoke with Special Agent Joseph Espinosa of the Social Security Office of

2

the Inspector General. Espinosa told Russell that the Social Security number Garcia had used on the forms belonged to Felisha Munguia of Edinburg, Texas.

As a result of the investigation, Garcia was charged with one count of identity theft. The complaint alleged:

> "That on or about the 25th day of May, 2012, in the City of Overland Park, County of Johnson, and State of Kansas, RAMIRO ENRIQUEZ GARCIA did then and there unlawfully, willfully, and feloniously obtain, possess, transfer, use, sell or purchase any personal identifying information, or document containing the same, to wit: [S]ocial [S]ecurity number belonging to or issued to another person, to wit: Felisha Munguia, with the intent to defraud that person, or anyone else, in order to receive any benefit, a severity level 8, nonperson felony, in violation of K.S.A. 21-6107, K.S.A. 21-6804 and K.S.A. 21-6807. (identity theft)"

Before trial, Garcia filed a motion to suppress the I-9 form he had filled out during the hiring process, relying on an express preemption provision in IRCA. At the hearing on the motion, Garcia noted, and the State agreed, that the State did not intend to rely on the I-9 as a basis of prosecution. Garcia then argued that, because the information contained on the I-9 was transferred to a W-4 form, the W-4 should be suppressed as well. The district judge refused to suppress the W-4.

At trial, Khalil Booshehri, a manager at Bonefish Grill, testified that Garcia had been a line cook for the restaurant and had been a good employee. Booshehri testified that Garcia was paid for his work as a line cook, was allowed to eat while on duty, and was eligible for overtime pay.

Jason Gajan, a managing partner at Bonefish Grill, testified about the restaurant's hiring process. The process typically begins with a short, informal interview when a person comes in looking for an application. If the manager determines that the person

3

meets the restaurant's basic requirements, he or she is given a card with instructions explaining how to fill out an online application.

With respect to Garcia's hiring specifically, the State introduced his employment application into evidence. The application contained basic information about Garcia's work history and education. The application did not disclose a Social Security number, although it contained a statement by Garcia that, if hired, he could verify his identity and legal right to work in the United States.

After receiving Garcia's application, Bonefish Grill decided to hire Garcia.

Once a hiring decision has been made, the restaurant sends an e-mail to the new hire with a packet of information, including documents to fill out. Gajan believed that in addition to the information packet, new hires also received W-4 and I-9 forms.

Garcia filled out electronic W-4 and K-4 tax forms, both of which were admitted into evidence. Each of the forms contained a Social Security number and was digitally signed by Garcia. Gajan testified that, in addition to the employee filling out the forms, Gajan would have had to see a paper Social Security card and then manually input the number from the card into an electronic document. After verifying the documents, Gajan would also have digitally signed the document himself. According to Gajan, he could not have proceeded with the hiring process if Garcia had not filled out the required forms.

Gajan also testified about the benefits Bonefish Grill offered to employees and the benefits Garcia received. According to Gajan, Garcia was paid for the hours he worked at Bonefish Grill, including overtime pay on occasion. During his shifts, Garcia was allowed to eat at the restaurant. In addition, Bonefish Grill offered employees health and dental insurance, as well as paid vacation; but Gajan conceded that Garcia had not worked at Bonefish Grill long enough to receive these benefits. Gajan believed that

4

Garcia would have received workers compensation benefits had he been injured on the job.

The State's final witness was Espinosa. He testified that he had searched the "Social Security Master File Database" and determined that the Social Security number Garcia had used was not assigned to Garcia. The number was assigned to Felisha Mari Munguia, who was born in 1996. The database showed that Munguia had been issued a second Social Security card in 2000. Espinosa also provided examples of hypothetical consequences that might be caused by a person using someone else's Social Security number. In a "case specifically like this," if a person were to

"come and work under your [S]ocial [S]ecurity number, it would report back wages for you[,] presumably making you insured into federal government programs that you may have not otherwise been entitled to.

"Conversely to that, let's say that you were receiving some disability or retirement benefits from one of these government programs. These earnings could adversely affect you, because it would indicate that you are working when in fact you might not be working, and you could be terminated from those benefits."

During cross-examination, Espinosa testified that he had never spoken to Munguia.

In closing argument, the prosecutor acknowledged that Garcia was "a hard worker" and "did well at his job." He conceded that "Mr. Booshehri did everything but tell you he was a very valuable employee. Mr. Gajan had nothing bad to say about him. He worked hard for Bonefish." But, according to the State, those facts did not matter because "in the State of Kansas, you cannot work under someone else's [S]ocial [S]ecurity number." The prosecutor also noted that Gajan "would not have hired [Garcia] if he did not have a [S]ocial [S]ecurity number."

5

After deliberations, the jury found Garcia guilty of identity theft. The district judge later sentenced Garcia to 7 months in prison but granted 18 months' probation.

This appeal followed.

## DISCUSSION

Garcia challenges his conviction because, in his view, this identity theft prosecution against him was preempted by IRCA.

All preemption arguments, including the as-applied one advanced by Garcia in this case, are based upon the Supremacy Clause of the United States Constitution. The Supremacy Clause gives Congress the power to preempt state law. *Arizona v. United States*, 567 U.S. 387, 398-99, 132 S. Ct. 2492, 183 L. Ed. 2d 351 (2012). When evaluating whether a state law is preempted, "'[t]he purpose of Congress is the ultimate touchstone.' *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S. Ct. 219, 223, 11 L. Ed. 2d 179 (1963)." *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S. Ct. 1185, 55 L. Ed. 2d 443 (1978).

Before focusing on the use of the Kansas identity theft statute challenged here, it is helpful to review the general law of preemption under the precedents of the United States Supreme Court and this court.

When all types, categories, and subcategories of preemption claims are considered, we discern eight possible ways a party may challenge an application of state law, alleging it is preempted by federal law.

6

First, there are traditionally two basic types of such challenges: facial and as-applied. When a party raises a facial challenge to application of state law, he or she claims that the law is preempted in all or virtually all cases. See *California Coastal Com'n v. Granite Rock Co.*, 480 U.S. 572, 588-89, 107 S. Ct. 1419, 94 L. Ed. 2d 577 (1987) (explaining concept of facial preemption).

In contrast, when a party raises an as-applied preemption challenge, he or she argues that state law may be constitutional when applied in some cases but not in the particular circumstances of his or her case. See *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 907 (10th Cir. 2016), *petition for cert. filed* June 5, 2017. In an as-applied challenge, the law under scrutiny can itself be "textually neutral," meaning "one [cannot] tell that the" law undermines federal policy "by looking at the text [alone]. Only when studying certain applications of the laws" do conflicts arise. *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1105 (9th Cir. 2016) (defining contours of as-applied challenge); see also 16 C.J.S., Constitutional Law § 243 ("An 'as applied' challenge is a claim that the operation of a statute is unconstitutional in a particular case while a facial challenge indicates that the statute may rarely or never be constitutionally applied.").

All of this said, "facial" and "as-applied" labels "parties attach to claims are not determinative" of the analysis a court will ultimately employ in a preemption case. See *Supreme Court of New Mexico*, 839 F.3d at 914. And the boundary between the two types of challenges is not impenetrable. Still, as with other types of cases alleging that a law is unconstitutional, "[t]he distinction is both instructive and necessary, for it goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 331, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010) (considering regulation of corporate political speech). Garcia challenges the use of law of general application to himself alone, *i.e.*, advances an as-applied claim. The State does not challenge his characterization. The relief provided in this case will flow solely to Garcia. The fact that the holding in his favor may have wider application,

7

*Morales*, 306 Kan. __, and *Ochoa-Lara*, 306 Kan. __, does not mean his preemption argument should be labeled "facial."

Regardless of whether a particular challenge qualifies as facial or as-applied, any preemption claim also fits one of two other categories: express and implied.

Express preemption depends upon the words used by Congress, which may explicitly limit a state's ability to legislate or apply its own constitutional or common law. "There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision." *Arizona*, 567 U.S. at 399; see also *Am. Trucking Associations, Inc. v. City of Los Angeles, Cal.*, 569 U.S. __, 133 S. Ct. 2096, 186 L. Ed. 2d 177 (2013) (facial, express challenge: certain provisions of concession agreements in clean air action plan expressly preempted by Federal Aviation Administration Authorization Act, which preempts a state "law, regulation, or other provision having the force and effect of law"); *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. __, 136 S. Ct. 936, 194 L. Ed. 2d 20 (2016) (as-applied, express challenge: Employee Retirement Income Security Act [ERISA] preempts Vermont statute establishing health care database for use in Vermont, by Vermont residents); *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 295, 255 P.3d 1186 (2011) (facial, express challenge: explicit statutory language from Congress compared to Kansas Recreational Trails Act).

Implied preemption arises when a federal statute's "structure and purpose" demonstrate that state law can have no application. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76, 129 S. Ct. 538, 172 L. Ed. 2d 398 (2008).

Implied preemption is further analytically divided into two subcategories: field and conflict.

A field preemption claim involves circumstances in which Congress has legislated so comprehensively on a subject that it has foreclosed any state regulation in that area. *Arizona*, 567 U.S. at 401. "Where Congress occupies an entire field, . . . even complementary state regulation is impermissible." *Arizona*, 567 U.S. at 401 (facial, field challenge:  IRCA fully occupies field of alien registration, thus preempting Arizona law requiring alien registration); *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. __, 135 S. Ct. 1591, 191 L. Ed. 2d 511 (2015) (as-applied, field challenge:  Natural Gas Act does not preempt state antitrust law as applied to federally regulated wholesale natural-gas prices).

Conflict preemption involves just that—conflict between federal law and state law. A conflict preemption claim can arise in one of two situations, which have been labeled "impossibility" and "obstacle."

Conflict-impossibility preemption arises in circumstances in which compliance with both federal and state law is, practically speaking, impossible. *Mut. Pharm. Co. v. Bartlett*, 570 U.S. __, 133 S. Ct. 2466, 186 L. Ed. 2d 607 (2013) (as-applied, conflict-impossibility challenge:  federal Food, Drug, and Cosmetic Act preempted state-law design-defect claim turning on adequacy of generic drug's warning; federal law precludes generic drug manufacturer from altering required warning).

Conflict-obstacle preemption involves circumstances in which application of state law erects an obstacle to achievement of Congress' objectives. *California v. ARC America Corp.*, 490 U.S. 93, 109 S. Ct. 1661, 104 L. Ed. 2d 86 (1989) (facial, conflict-obstacle challenge:  Alabama, Arizona, California, Minnesota antitrust laws compared to federal provisions); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000) (facial, conflict-obstacle challenge:  Massachusetts law barring companies from doing business with Burma presents obstacle to federal Foreign Commerce Clause); *Supreme Court of New Mexico*, 839 F.3d at 928 (conflict-obstacle challenge with facial and as-applied features:  New Mexico rule governing professional

conduct of federal prosecutors conflicts with federal law on grand jury subpoena practices; rule imposes "far more onerous conditions" than federal law).

As we turn to evaluating the applicability of these preemption concepts in this case, we first address two preliminary matters:  preservation of the preemption issue and the potential applicability of a presumption against preemption.

*Preservation of Preemption Issue*

As stated above, a party's label on his or her preemption challenge does not inevitably control the analysis a court can employ. See *Supreme Court of New Mexico*, 839 F.3d at 914-15 ("labels the parties attach to claims are not determinative"). Simply put, a court's analysis of a preemption challenge is not bound to color within any party's lines. See *Hillman v. Maretta*, 569 U.S. __, 133 S. Ct. 1943, 1954, 186 L. Ed. 2d 43 (2013) (presence of express preemption clause does not necessarily end court's preemption inquiry); *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (2000) (express preemption provision does not bar ordinary working of conflict preemption principles); *Supreme Court of New Mexico*, 839 F.3d at 912, 914-915 (facial, as-applied preemption claims legal in nature; judicial estoppel doctrine does not apply to limit party to label first attached to challenge); see also *Hughes v. Talen Energy Mktg.*, *LLC*, 578 U.S. __, 136 S. Ct. 1288, 1301, 194 L. Ed. 2d 414 (2016) (Thomas, J., concurring in part and concurring in the judgment) (state law could have been preempted "based on the statute alone"; majority unnecessarily relies on principles of implied preemption). Compare *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 109, 112 S. Ct. 2374, 120 L. Ed. 2d 73 (1992) (O'Connor, J., plurality) (state law impliedly preempted by Occupational Safety and Health Act), with *Gade*, 505 U.S. at 109-14 (Kennedy, J., concurring in part and concurring in the judgment) (would have found state law expressly preempted). This approach to preemption challenge analysis is consistent with the more widely applicable practice of allowing a party who properly

preserves a federal claim to make any appellate argument in support of that claim. See *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 534, 112 S. Ct. 1522, 118 L. Ed. 2d 153 (1992) (considering federal takings case).

Here, Garcia's preemption issue was preserved in the district court through defense IRCA arguments in favor of suppression and a subsequent evidentiary objection. In his brief to the Court of Appeals, Garcia advanced express, field, and conflict-obstacle preemption challenges—all as-applied to Garcia only. The State responded in kind in its brief. In Garcia's petition for review to this court, he repeated his three-pronged approach to preemption. It was not until oral argument that his counsel, when pressed, concentrated his argument on as-applied, field preemption. Again, even after this limitation, we are free to consider any type, category, or subcategory of preemption supported by the appellate record and applicable law.

*Potential Application of Presumption Against Preemption*

The United States Supreme Court has sometimes recited that it presumes no preemption. See *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 627, 131 S. Ct. 2567, 180 L. Ed. 2d 580 (2011) (Sotomayor, J., dissenting, joined by Ginsburg, Breyer, and Kagan, JJ.) ("In the context of express [preemption], we read federal statutes whenever possible not to [preempt] state law."); *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77, 129 S. Ct. 538, 558, 172 L. Ed. 2d 398 (2008) (Stevens, J.) (when text of preemption clause susceptible to more than one plausible reading, courts ordinarily accept reading disfavoring preemption). And we have recited and applied such a presumption in some but not all of this court's earlier preemption cases. See *Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. at 301 (applying presumption to implied preemption analysis); *Continental Slip Form Builders, Inc. v. Local Union*, 195 Kan. 572, 573, 408 P.2d 620 (1965) (not applying presumption).

11

But the reality is that under United States Supreme Court precedent, the necessity of indulging such a presumption in an express preemption case is far from clear.

Three members of the current Court—Chief Justice John G. Roberts and Justices Clarence Thomas and Samuel A. Alito—and the now departed Justice Antonin G. Scalia have recognized that the Court has not consistently applied the presumption to express preemption cases and have said it should not be so applied. *Altria Grp., Inc.*, 555 U.S. at 102-03 (Thomas, J., dissenting, joined by Roberts, C.J., and Scalia and Alito, JJ.) (since 1992 decision in *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 518, 112, S. Ct. 2608, 120 L. Ed. 2d 407 [1992], presumption applied only intermittently in express preemption cases; Court should employ only ordinary rules of statutory construction in such cases). And the wording of opinions authored by Justice Anthony M. Kennedy betray at least some ambivalence about the merit of applying a presumption of Congressional intent when Congress has already included express preemption language in a statute. See *CTS Corp. v. Waldburger*, 573 U.S. __, 134 S. Ct. 2175, 2189, 189 L. Ed. 2d 62 (2014) (Kennedy, J., writing for plurality including himself, Sotomayor and Kagan, JJ.) (application of presumption in analysis of express preemption clause to determine narrow interpretation "where plausible" proper); *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. ___, 133 S. Ct. 2247, 2261, 186 L. Ed. 2d 239 (2013) (Kennedy, J., concurring in part and concurring in judgment) ("presumption" label avoided in favor of "principle"; "cautionary" principle ensures preemption "does not go beyond the strict requirements of the statutory command").

Indeed, careful review of a single case exposes the range of positions on application of the presumption in an express preemption case held by Court members. In that case, *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 322, 128 S. Ct. 999, 169 L. Ed. 2d 892 (2008), the Court considered whether federal law preempted state-law claims of negligence, strict liability, and implied warranty in a case regarding the manufacture of a balloon catheter. Justice Scalia, writing for a majority including Chief Justice Roberts and

12

Justices Kennedy, Souter, Thomas, Breyer, and Alito, interpreted an express preemption clause without applying the presumption and held that state law was preempted. See 552 U.S. at 322-30. Justice Stevens concurred in part and in the judgment; he would not have applied the presumption and agreed that the state law was preempted. See 552 U.S. at 330-32 (Stevens, J., concurring). Finally, Justice Ginsburg dissented. She would have applied the presumption and would have held that the state law was not preempted. See 552 U.S. at 333-35 (Ginsburg, J., dissenting).

Lacking contrary clarity from the United States Supreme Court, we hold that it is unnecessary to apply a presumption against preemption when a court evaluates the merit of an express preemption claim, as long as the language of the congressional enactment at issue is clear. This makes logical and legal sense. There is simply no need to presume congressional intent when Congress has stated its intent explicitly. See *Kanza Rail-Trails Conservancy*, 292 Kan. at 296 ("'[*I*]*n the absence of express preemption in a federal law*, there is a strong presumption that Congress did not intend to displace state law.'" [Emphasis added.] [Quoting *Zimmerman v. Board of Wabaunsee County Comm'rs*, 289 Kan. 926, 975, 218 P.3d 400 (2009).]). We agree that

> "[w]hen Congress has considered the issue of pre-emption and has included in the
> enacted legislation a provision explicitly addressing that issue, and when that provision
> provides a 'reliable indicium of congressional intent with respect to state authority,'
> *Malone v. White Motor Corp.*, 435 U.S., at 505, 'there is no need to infer congressional
> intent to pre-empt state laws from the substantive provisions' of the legislation. *California
> Federal Savings & Loan Assn. v. Guerra*, 479 U.S. 272, 282 (1987) (opinion of Marshall,
> J.)." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517, 112 S. Ct. 2608, 120 L. Ed. 2d
> 407 (1992) (Stevens, J.).

This approach also has the considerable virtue of consistency with our modern rubric for statutory interpretation and construction in all other contexts. "The fundamental rule of statutory interpretation is that the intent of the legislature is dispositive if it is

13

possible to ascertain that intent. *State v. Looney*, 299 Kan. 903, 906, 327 P.3d 425 (2014)." *Merryfield v. Sullivan*, 301 Kan. 397, 399, 343 P.3d 515 (2015) (considering provisions of Kansas Sexually Violent Predator Treatment Program). Our "primary consideration in ascertaining the intent of the legislature" is the language of a statute; we think "the best and only safe rule for determining the intent of the creators of a written law is to abide by the language that they have chosen to use." 301 Kan. at 399. This court does not move from interpretation of plain statutory language to the endeavor of statutory construction, including its reliance on extra-textual legislative history and canons of construction and other background considerations, unless the plain language of the legislature or Congress is ambiguous. See *City of Dodge City v. Webb*, 305 Kan. 351, 356, 381 P.3d 464 (2016) (state statute under consideration); *Sierra Club v. Moser*, 298 Kan. 22, 53-54, 310 P.3d 360 (2013) (federal statute under consideration).

*Express Preemption*

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394. In line with that power, Congress enacted the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, which "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 587, 131 S. Ct. 1968, 179 L. Ed. 2d 1031 (2011) (quoting *De Canas v. Bica*, 424 U.S. 351, 353, 359, 96 S. Ct. 933, 47 L. Ed. 2d 43 [1976]).

In 1986, Congress supplemented the INA by enacting IRCA, which comprehensively regulates employment of aliens. See Pub. L. No. 99-603; *Arizona*, 567 U.S. at 404. According to a 1986 House Report, Congress sought "to close the back door on illegal immigration so that the front door on legal immigration may remain open," and

14

it attempted to achieve this goal predominantly through employer sanctions. H.R. REP. 99-682, 46, 1986 U.S.C.C.A.N. 5649, 5650.

Section 101 of IRCA became 8 U.S.C. § 1324a. It provides in pertinent part that the employment of unauthorized aliens is unlawful. 8 U.S.C. § 1324a(a) (2012). It also establishes an employment verification system that requires employers to attest to their employee's immigration status. 8 U.S.C. § 1324a(b). Failure to comply with the requirements can result in civil penalties, and a pattern or practice of violations can result in both civil and criminal penalties against an employer. 8 U.S.C. § 1324a(e), (f).

In turn, 8 C.F.R. § 274a.2 was promulgated in 1987 by the Immigration and Naturalization Service, which was then part of the Department of Justice, to implement 8 U.S.C. § 1324a. The regulation provides for an employment verification system, and its § 274a.2 identifies Form I-9 as the form to be used by an employer when verifying such eligibility. The employer must ensure that a potential employee completes the I-9, must examine the potential employee's identification and work authorization documents, must complete the employer portion of the I-9, and must sign an attestation. See also Pub. L. No. 99-603, § 101(a)(1). A Social Security card is one of the documents an employer may examine to establish employment eligibility. 8 C.F.R. § 274a.2(b)(1)(v)(C)(1) (2016).

Congress included an express preemption clause having to do with employers in IRCA. 8 U.S.C. § 1324a(h)(2). It also included the following language:

> "A form designated or established by the Attorney General under this subsection *and any information contained in* or appended to such form, may not be used for purposes other than for enforcement of this chapter and sections 1001, 1028, 1546, and 1621 of Title 18." (Emphasis added.) 8 U.S.C. § 1324a(b)(5).

Title 18 of the United States Code (2012) deals with Crimes and Criminal Procedure. Section 1001 deals with fraud and false statements generally; § 1028 deals with fraud and related activity in connection with identification documents, authentication features, and information; § 1546 deals with fraud and misuse of visas, permits, and other documents; and § 1621 deals with perjury generally. Despite references in the legislative history to Congress emphasizing penalties for employers rather employees, IRCA specifically amended § 1546 to include criminal sanctions against an alien who commits fraud in the employment eligibility verification process. See Pub L. No. 99-603, § 103.

Of course, the case before us does not arise under 18 U.S.C. § 1546(b). Rather, it is a State prosecution under a generally applicable statute prohibiting identity theft. The State seeks to punish an alien who used the personal identifying information of another to establish the alien's work authorization. Again, this means that Garcia's preemption challenge, no matter which category, is an as-applied type. He does not seek to prevent all prosecutions under the state law. His challenge can fairly be characterized as "facial" in the traditional sense only insofar that its holding will apply to other aliens in his position, *i.e.*, those who use the Social Security card or other document listed in federal law of another for purposes of establishing employment eligibility. See *Supreme Court of New Mexico*, 839 F.3d at 907.

Garcia has relied heavily on *Arizona*, 567 U.S. 387, to support what his counsel termed his field preemption argument. But *Arizona* actually has limited influence on that particular argument.

In *Arizona*, the Supreme Court determined that Congress has fully occupied the field of alien *registration*. On the other hand, the only provision considered in that case that is somewhat analogous to the prosecution's use of the identity theft statute in this case was section 5(C), which made it a misdemeanor for an alien to seek or engage in

16

work. Section 5(C) was not field preempted. Rather, it was preempted under conflict-obstacle theory because it "involve[d] a conflict in the method of enforcement." *Arizona*, 567 U.S. at 406 (section 5[C]'s criminal penalty stands as obstacle to IRCA, which does not impose criminal penalties on unauthorized employees).

Garcia has also directed our attention to the *Puente Arizona v. Arpaio* series of federal decisions.

The first time *Puente Arizona* came before a district judge, the judge was considering whether two Arizona state statutes were constitutional. 76 F. Supp. 3d 833 (D. Ariz. 2015), *reconsideration denied* No. CV-14-01356-PHX-DGC, 2015 WL 1432674 (D. Ariz. 2015) (unpublished opinion), *and rev'd in part, vacated in part* 821 F.3d 1098 (9th Cir. 2016). The plaintiffs were a civil rights organization and separate individuals, including at least one who had been convicted under the challenged laws, which criminalized "the act of identity theft done with the intent to obtain or continue employment" and forgery generally. 76 F. Supp. 3d at 842. Plaintiffs sought a preliminary injunction, asking the district judge to enjoin enforcement of the laws. The plaintiffs invoked IRCA to claim that the laws were facially preempted and as applied, under both field and conflict principles. The district judge ruled that the plaintiffs had demonstrated a likelihood of success for facial field and facial conflict preemption and granted a temporary injunction. 76 F. Supp. 3d at 858, 861.

On appeal the Ninth Circuit reversed, holding that the neutral application of the laws to all defendants was fatal to the facial challenge. *Puente Arizona*, 821 F.3d at 1105. The circuit panel remanded to the same district judge for consideration of the plaintiffs' as-applied challenges. 821 F.3d at 1110.

On remand, the district judge considered the plaintiffs' conflict and field preemption arguments. *Puente Arizona v. Arpaio*, No. CV-14-01356-PHX-DGC, 2016

WL 6873294, at *6 (D. Ariz. 2016). He treated the language in 8 U.S.C. § 1324a(b)(5) as a "use limitation" and ruled that Congress intended "to preempt a relatively narrow field: state prosecution of fraud in the I-9 process." 2016 WL 6873294, at *12. "[U]se limitation certainly is relevant in assessing Congress's intent for preemption purposes, but the focus of the provision is quite narrow. *It applies only to Form I-9 and documents appended to the form*." 2016 WL 6873294, at *8. (Emphasis added.) On field preemption, the judge ruled that he could not conclude that Congress had "expressed a clear and manifest intent to occupy the field of unauthorized alien fraud in seeking employment. The focus of the criminal statute, 18 U.S.C. § 1546, is the I-9 process." 2016 WL 6873294, at *11. The district judge also determined prosecution of aliens under the state statutes was not preempted because of conflict either because of the impossibility of enforcing both state and federal law or because enforcement of state law erected a barrier or obstacle to full realization of federal policy goals. "The Court sees no strong showing of conflict between the application of the identity theft and forgery statutes outside the I-9 process and federal statutes that are limited to that process." 2016 WL 6873294, at *15.

In a still later decision in the series, the district judge addressed the plaintiffs' argument that its November 2016 preemption decision in favor of the plaintiffs was narrower than it should be, and he "clarified" his preemption holding. *Puente Arizona v. Arpaio*, No. CV-14-01356-PHX-DGC, 2017 WL 1133012, at *5-8 (D. Ariz. 2017). Specifically, the judge recognized that the federal I-9 verification system, which requires a prospective employee to present certain documents demonstrating employment eligibility to the prospective employer and permits the employer to retain copies of those documents, potentially including among them a Social Security card,

> "suggests that Congress intended to protect more than the I-9 and documents physically attached to it. The Court sees no logical reason why Congress would prohibit state law-enforcement officers from using the Form I-9 and documents physically attached to it,

18

and yet permit them to use [designated employment eligibility documents including Social Security cards] submitted with [the] I-9 simply because they were never stapled to the I-9 or were stored by the employer in a folder separate from the I-9. This is particularly true when one considers other statutory sections.

"Section 1324a(d) provides guidance for future variations of the federal employment verification system. It makes clear that even if the Form I-9 is replaced or new documentation requirements are created, the use limitation will continue to prohibit use of the employment verification system for non-enumerated purposes. The statute sates that '[t]he system may not be used for law enforcement purposes, other than for enforcement of this chapter or sections 1001, 1028, 1546, and 1621 of Title 18.' 8 U.S.C. § 1324(d)(2)(F); *see also* 8 U.S.C. § 1324(d)(2)(G) (prohibiting the use for non-enumerated purposes of any new document or card designed for the federal employment verification system). This suggests that Congress intended to bar the use of the verification process itself, not just the I-9 and physically attached documents, in state law enforcement. Additionally, § 1324(d)(2)(C) provides that '[a]ny personal information utilized by the system may not be made available to Government agencies, employers, and other persons except to the extent necessary to verify that an individual is not an unauthorized alien.' This limitation is not restricted to information contained in or appended to any specific document, but applies generally to the federal employment verification system.

"Statutes imposing criminal, civil, and immigration penalties for fraud committed in the employment verification process also reflect a congressional intent to regulate more than the Form I-9 and physically attached documents. . . .

. . . .

". . . The Court continues to hold the view that Congress did not intend to preempt state regulation of fraud outside the federal employment verification process, as stated in its summary judgment ruling . . . . But the Court concludes from the provisions reviewed above that Congress's preemptive intent was not limited to the Form I-9 and physically attached documents. Congress also regulated—and intended to preempt state use of—other documents used to show employment authorization under the federal

19

system. As the Ninth Circuit has noted, 'field preemption can be inferred . . . where there is a regulatory framework so pervasive . . . that Congress left no room for the States to supplement it.' *Valle del Sol* [*v.Whiting*], 732 F.3d [1006,] 1023 [(2013)] (internal quotation and brackets omitted); Laurence H. Tribe, *American Constitutional Law*, § 6-31, at 1206-07 (same).

"This conclusion is supported by the legislative history of the Immigration Reform and Control Act, which reflects Congress's '[c]oncern . . . that verification information could create a "paper trail" resulting in the utilization of this information for the purpose of apprehending undocumented aliens. 'H.R. Rep. 99-682(III) (1986) at 8-9. If documents presented solely to comply with the federal employment verification system could be used for state law enforcement purposes so long as they were not physically attached to a Form I-9, this congressional intent easily would be undermined.

"The Court's conclusion is also supported by recent decisions from other courts. Reviewing the use limitation and several other provisions of § 1324a, the Supreme Court found that 'Congress has made clear . . . that *any information employees submit to indicate their work status* "may not be used" for purposes other than prosecution under specific federal criminal statues for fraud, perjury, and related conduct.' *Arizona v. United States*, 567 U.S. 387 (2012) (citing 8 U.S.C. §§ 1324a(b)(5), (d)(2)(F)-(G)) (emphasis added). The Ninth Circuit reached a similar conclusion. *United States v. Arizona*, 641 F.3d 339, 359 (9th Cir. 2011), *aff'd in part, rev'd in part and remanded* (reviewing 8 U.S.C. § 1324a and finding that the federal employment verification system and any personal information it contains cannot be used for any non-enumerated purpose, including investigating and prosecuting violations of Arizona law).

"In summary, the Court concludes that Congress clearly and manifestly intended to prohibit the use of the Form I-9, documents attached to the Form I-9, and documents submitted as part of the I-9 employment verification process, whether attached to the form or not, for state law enforcement purposes . . . . Defendants are preempted from (a) employing or relying on (b) any documents or information (c) submitted to an employer solely as part of the federal employment verification process (d) for any investigative or prosecutorial purpose under the Arizona identi[t]y theft and forgery statutes. As Plaintiffs concede, Defendants may use [designated employment eligibility documents including

Social Security cards] submitted in the I-9 process if they were also submitted for a purpose independent of the federal employment verification system, such as to demonstrate the ability to drive or as part of a typical employment application." *Puente Arizona*, 2017 WL 1133012, at *6-8.

Although we might be inclined to agree with the ultimate *Puente Arizona* decision from the district judge, it nevertheless has limited influence today because we dispose of this case under the plain and unambiguous language of 8 U.S.C. § 1324a(b)(5), an effective express preemption provision having to do with *employees* as well as employers. When the *Puente Arizona* district judge was considering the plaintiffs' as-applied challenges, he was focused only on field and conflict preemption analysis. No party was urging express preemption, which provides a much more direct route to a similar result. The language in 8 U.S.C. § 1324a(b)(5) explicitly prohibited state law enforcement use not only of the I-9 itself but also of the "*information contained in*" the I-9 for purposes other than those enumerated. 8 U.S.C. § 1324a(b)(5). In short, in March of this year, the *Puente Arizona* district judge admirably recognized that he had unduly narrowed his interpretation of the "use limitation" in the statute. It had simply been incorrect to say that only use of the I-9 and attached documents was covered. But his focus on whether other documents need or need not be attached to the I-9 at some point still ignored the "information contained in" plain language of the statute.

We do not ignore this language. It is Congress' plain and clear expression of its intent to preempt the use of the I-9 form *and any information contained* in the I-9 for purposes other than those listed in §1324a(b)(5). See *Whiting*, 563 U.S. at 594 ("[W]e 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent.' *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S. Ct. 1732, 123 L. Ed. 2d 387 [1993]."). Prosecution of Garcia—an alien who committed identity theft for the purpose of establishing work eligibility—is not among the purposes allowed in IRCA. Although the State did not rely on the I-9, it does not follow that the

21

State's use of the Social Security card information was allowed by Congress. "A State may not evade the pre-emptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 638, 133 S. Ct. 1391, 185 L. Ed. 2d 471 (2013).

The "key question" when evaluating whether a state law is preempted is congressional intent. That intent is spelled out for us in 8 U.S.C. § 1324a(b)(5):  States are prohibited from using the I-9 *and any information contained within the I-9* as the bases for a state law identity theft prosecution of an alien who uses another's Social Security information in an I-9. The fact that this information was included in the W-4 and K-4 did not alter the fact that it was also part of the I-9.

Because we can dispose of Garcia's preemption claim based on the express preemption language in 8 U.S.C. § 1324a(b)(5), we need not decide the merits of any other possible or actual preemption argument.

CONCLUSION

We reverse Garcia's conviction because the State's identity theft prosecution of him based on the Social Security number contained in the I-9 used to establish his employment eligibility was expressly preempted.

JOHNSON, J., not participating.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

* * *

---

[1]**REPORTER'S NOTE:**  Senior Judge Malone was appointed to hear case No. 112,502 vice Justice Johnson under the authority vested in the Supreme Court by K.S.A. 20-2616.

LUCKERT, J., concurring: I concur in the majority's holding that 8 U.S.C. § 1324a(b)(5) (2012) preempts the prosecution of Ramiro Garcia for identity theft under the circumstances of this case. But I reach this holding through a different analytical path than the one used by the majority. I respectfully disagree with the majority's conclusion that express preemption applies, although I would nevertheless hold that Kansas' identity theft statute intrudes into a field wholly occupied by federal law. I would further hold that a conflict exists between the immigration policy established by Congress and Kansas' identity theft statute when it is applied in a case, as here, that is dependent upon the use of information derived from the employment verification process established by the Immigration Reform and Control Act of 1986 (IRCA), Pub. L. No. 99-603, and the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 et seq. (2012). In other words, I would apply the doctrines of field and conflict preemption, rather than express preemption.

Although Congress included an express preemption provision in 8 U.S.C. § 1324a(h)(2) (2012), it applies only to certain laws relating to *employers*. Specifically, it states: "The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." 8 U.S.C. § 1324a(h)(2). As the United States Supreme Court has indicated, notably missing from this provision is any language expressly preempting State or local laws imposing civil or criminal sanctions on prospective or actual *employees*. *Arizona v. United States*, 567 U.S. 387, 406, 132 S. Ct. 2492, 183 L. Ed. 2d 351 (2012) ("IRCA's express preemption provision, which in most instances bars States from imposing penalties on employers of unauthorized aliens, is silent about whether additional penalties may be imposed against the employees themselves.").

23

In the face of this conclusion by the United States Supreme Court, the majority relies on "an effective express preemption provision," 8 U.S.C. § 1325a(b)(5). Slip op. at 21. In my view, describing a statutory provision as "an effective express preemption provision" regarding employees miscasts implied preemption as express preemption. Stated another way, a provision that "effectively" preempts state law only impliedly preempts state law. Generally, when the United States Supreme Court has labelled statutory language as "an express preemption provision" it has been worded more like 8 U.S.C. § 1324a(h)(2) ("this section preempt[s] any State or local law") than § 1324a(b)(5) ("A form designated or established by the Attorney General under this subsection and any information contained in or appended to such form, may not be used for purposes other than for enforcement of this chapter . . . .").

Granted, the United States Supreme Court has never required "magic words" before labeling statutory language as express preemption provisions. See *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 112, 112 S. Ct. 2374, 120 L. Ed. 2d 73 (1992) (Kennedy, J., concurring). But, as a practical matter, the Court has only applied the express preemption label when the statutory language or title has included terms like "supersede," "preempt," or "preemption," or when the statutory language has explicitly prohibited a state or local entity from enacting or enforcing a specified type of law. See, *e.g.*, *Coventry Health Care of Missouri, Inc. v. Nevils*, 581 U.S. ___, 137 S. Ct. 1190, 1192, 197 L. Ed. 2d 572 (2017); *Puerto Rico v. Franklin California Tax-Free Tr.*, 579 U.S. ___, 136 S. Ct. 1938, 1945, 195 L. Ed. 2d 298 (2016); *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. ___, 136 S. Ct. 936, 943, 194 L. Ed. 2d 20 (2016); *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. ___, 134 S. Ct. 2228, 2235, 189 L. Ed. 2d 141 (2014); *Am. Trucking Associations, Inc. v. City of Los Angeles, Cal.*, 569 U.S. ___, 133 S. Ct. 2096, 2102, 186 L. Ed. 2d 177 (2013); *Hillman v. Maretta*, 569 U.S. __, 133 S. Ct. 1943, 1948, 186 L. Ed. 2d 43 (2013); *Altria Grp., Inc. v. Good*, 555 U.S. 70, 78, 129 S. Ct. 538, 172 L. Ed. 2d 398 (2008); *Sprietsma v. Mercury Marine*, 537 U.S. 51, 62-63, 123 S. Ct. 518, 154 L. Ed. 2d 466 (2002); see also *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 388-89,

24

79 S. Ct. 818, 3 L. Ed. 2d 893 (1959) (under federal law, titles of statutes indicate congressional intent). Here, Congress did not enact similar explicit language preempting state civil or criminal proceedings against *employees*. Accordingly, I would not apply an express preemption analysis.

Of course, "the existence of an 'express preemption provisio[n] does not bar the ordinary working of conflict preemption principles' or impose a 'special burden' that would make it more difficult to establish the preemption of laws falling outside the clause." *Arizona*, 567 U.S. at 406 (quoting *Geier v. American Honda Motor Co.,* 529 U.S. 861, 869-72, 120 S. Ct. 1913, 146 L. Ed. 2d 914 [2000]). In my view, both field and conflict preemption apply to prevent the State's prosecution of Garcia.

These preemptions do not arise *facially*. In other words, IRCA does not preempt the Kansas identity theft statute in all cases, but it does preempt the prosecution of the defendant in this case. The crime of identity theft, as applicable to this case, requires proof of "obtaining, possessing, transferring, using, selling or purchasing any personal identifying information" of another with the intent "to receive any benefit." K.S.A. 2012 Supp. 21-6107. Here, the State alleges Garcia, an unauthorized alien, possessed a false Social Security number for the purpose of receiving taxable income from employment— *i.e.*, with the intent to receive a benefit. Under those circumstances, preemption arises because of a conflict with federal immigration laws and regulations, specifically those relating to the employment verification system. But the potential application of 21-6107 is much broader. An unauthorized alien could use someone else's personal identifying information to receive loans, credit cards, banking privileges, or a variety of other benefits without implicating federal provisions relating to the employment of unauthorized aliens. And individuals who are not unauthorized aliens could use stolen personal identifying information to obtain employment without violating federal law regarding immigration or the employment of unauthorized aliens. Thus, facially, the provisions do not precisely overlap.

The identity theft statute can still be preempted, however, *as applied* to receiving the benefit of employment. See *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1062-63 (9th Cir. 2014) ("In considering whether a state law is conflict-preempted, 'we "consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written."'"). And a statute "is not saved from pre-emption simply because the State can demonstrate some additional effect outside of the [preempted area]." *Gade*, 505 U.S. at 107; see *Hillman*, 133 S. Ct. at 1953 (holding a state statute was preempted only as applied to federal employees).

When considering Kansas' identity theft statute as applied to the employment of unauthorized aliens, several aspects of the "structure and purpose" of IRCA and INA demonstrate that implied preemption arises and that Kansas' identity theft statute can have no application in the context of the employment of unauthorized aliens. See *Altria Grp.*, 555 U.S. at 76 (discussing implied preemption generally and the role of structure and purpose). As the United States Supreme Court has observed, IRCA "forcefully" made combating the employment of illegal aliens central to "[t]his policy of immigration law." *INS v. National Center for Immigrants' Rights, Inc.*, 502 U.S. 183, 194, and n.8, 112 S. Ct. 551, 116 L. Ed. 2d 546 (1991). And in *Hoffman Plastic Compounds, Inc. v. N.L.R.B.*, 535 U.S. 137, 147-49, 122 S. Ct. 1275, 152 L. Ed. 2d 271 (2002), the Court observed that IRCA's "extensive" employment verification system "is critical to the IRCA regime." 535 U.S. at 147-48.

This process includes an extensive system that regulates employers and provides for potential criminal and civil penalties if employers fail to comply. The *Hoffman* Court discussed those various provisions. It then turned to provisions covering *employees* and noted:

"IRCA also makes it a crime for an unauthorized alien to subvert the employer verification system by tendering fraudulent documents. [8 U.S.C.] § 1324c(a). It thus prohibits aliens from using or attempting to use 'any forged, counterfeit, altered, or falsely made document' or 'any document lawfully issued to or with respect to a person other than the possessor' for purposes of obtaining employment in the United States. §§ 1324c(a)(1)-(3). Aliens who use or attempt to use such documents are subject to fines and criminal prosecution. 18 U.S.C. § 1546(b)." 535 U.S. at 148.

Considering these statutes, the *Hoffman* Court concluded an unauthorized alien who had used the birth certificate of a friend born in Texas in order to obtain employment "violated these provisions." 535 U.S. at 148. Based on its survey of the comprehensive array of regulatory, civil, and criminal provisions surrounding the employment verification system, the Court concluded:

"Under the IRCA regime, it is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies. Either the undocumented alien tenders fraudulent identification, which subverts the cornerstone of IRCA's enforcement mechanism, or the employer knowingly hires the undocumented alien in direct contradiction of its IRCA obligations." 535 U.S. at 148.

As part of this comprehensive IRCA system, Congress enacted a provision limiting the use of information contained on or appended to the I-9 form: "A form designated or established by the Attorney General under this subsection and any information contained in or appended to such form, may not be used for purposes other than for enforcement of this chapter and sections 1001, 1028, 1546, and 1621 of Title 18." 8 U.S.C. § 1324a(b)(5). The majority focuses on this provision and notes that a Social Security card is one of the documents an employer may examine to establish employment eligibility. 8 C.F.R. § 274a.2(b)(1)(v)(C)(1). Another provision, 8 U.S.C. § 1324a(d)(2)(C), states that "[a]ny personal

27

information utilized by the system may not be made available to Government agencies, employers, and other persons except to the extent necessary to verify that an individual is not an unauthorized alien." These provisions effectively prevent the investigation or prosecution of identity theft when the crime is based on documents supplied or completed during the employment verification process. See *Puente Arizona v. Arpaio*, No. CV-14-01356-PHX-DGC, 2017 WL 1133012, at *5-8 (D. Ariz. 2017); *Puente Arizona v. Arpaio*, No. CV-14-01356-PHX-DGC, 2016 WL 6873294, at *6 (D. Ariz. 2016).

Through this comprehensive statutory scheme, Congress has occupied the field and prohibited the use of false documents, including those using the identity of others, when an unauthorized alien seeks employment. Accordingly, under the doctrine of field preemption, the State cannot prosecute Garcia, an unauthorized alien, for identity theft related to false documentation supplied to his employer. See *State v. Martinez*, 896 N.W.2d 737, 755-56 (Iowa 2017).

The State in this case attempts to dodge field preemption by noting the district court did not admit the I-9 form completed as part of Garcia's employment process; instead, the district court allowed the admission, over Garcia's objection, of Garcia's tax withholding (W-4 and K-4) forms, which also included the stolen Social Security number. But the State does not explain what benefit Garcia received from these forms other than his employment and the taxable salary derived therefrom, which circles back to the I-9 that had to be completed in order for Garcia to gain employment. But even assuming the State could establish this element, it cannot avoid the reality that the W-4 and K-4 were completed with information—*i.e.*, the unauthorized Social Security number and false name—from the I-9 and accompanying documents. The State cannot avoid the doctrine of conflict preemption.

Conflict preemption bars the use of Kansas' identity theft statute under the circumstances of this case because it "frustrates congressional purpose and provides an obstacle to the implementation of federal immigration policy by usurping federal enforcement discretion in the field of unauthorized employment of aliens." *Martinez*, 896 N.W.2d at 756. As the Iowa Supreme Court explained:

"[T]he full purposes and objectives of Congress in the employment of unlawful immigrants include the establishment of a comprehensive federal system of control with a unified discretionary enforcement regime. As noted in [*United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013)], it is the prerogative of federal officials to police work authorization fraud by aliens. 720 F.3d at 533. Federal discretion in the enforcement of immigration law is essential to its implementation as a harmonious whole. The reasons for exercise of federal discretion are varied. . . .

"Local enforcement of laws regulating employment of unauthorized aliens would result in a patchwork of inconsistent enforcement that would undermine the harmonious whole of national immigration law." *Martinez*, 896 N.W.2d at 756.

In *Martinez*, "[f]ederal authorities . . . appear[ed] to be willing to defer any potential federal immigration action on equitable and humanitarian grounds." 896 F.2d at 756. In contrast, the *Martinez* state prosecutor "seem[ed] to have a different philosophy" that exposed Martha Araceley Martinez to significant prison terms and deportation. "If such local exercise of prosecutorial discretion were permitted, the harmonious system of federal immigration law related to unauthorized employment would literally be destroyed." 896 N.W.2d at 757. As the Chief Justice of the Iowa Supreme Court more broadly stated in a concurring opinion: "As applied to unauthorized aliens who use identification information in seeking employment, the law interferes with the efforts of Congress to regulate matters governing unauthorized alien employees every bit as it interfered in *Arizona*[, 567 U.S. 387]." 896 N.W.2d at 759 (Cady, C.J., concurring).

29

Consistent with the majority and various concurring opinions of the Iowa Supreme Court, I would hold that conflict preemption prevents the State from prosecuting Garcia.

Prosecuting Garcia for identity theft under the facts of this case intrudes into an area occupied wholly by federal law and conflicts with the policy established by Congress through IRCA, INA, and specifically the employment verification system. As a result, in this case prosecution of Garcia under K.S.A. 2012 Supp. 21-6107 is preempted by Article VI, Clause 2 of the United States Constitution.

* * *

BILES, J., dissenting:  I disagree that 8 U.S.C. § 1324a(b)(5) (2012) creates an as-applied, express federal preemption barring Ramiro Garcia's state law prosecution for identity theft when he used someone else's Social Security number to complete tax forms while being hired as a restaurant worker. The majority's rationale sets up a sweeping prohibition against identity theft prosecutions for such crimes generally occurring in the employment process. I also cannot conclude any other federal preemption theory carries the day under these facts, so I dissent.

Garcia was convicted under our state's identity theft law, K.S.A. 2012 Supp. 21-6107, for using someone else's Social Security number to receive a benefit, *i.e.*, employment. The statute does not make it illegal to attempt to secure employment as an unauthorized alien. The specific conduct for which Garcia was convicted was using someone else's Social Security number in completing his federal W-4 and state K-4 tax forms. Garcia's immigration status was not relevant to whether this conduct was unlawful, and the conduct was independent of the federal employment verification system. The tax forms are used solely to calculate federal and state income tax withholdings—not to verify a person's authority to work in the United States.

30

Under these circumstances, the question put to us is whether Garcia's use of someone else's identifying information within the employment setting sufficiently implicates the narrow area controlled by Congress through the federal Immigration Reform and Control Act of 1986 (IRCA). In answering that question, the majority holds states cannot use the Form I-9 or any information contained in it, and the fact that one uses the information elsewhere—the W-4, K-4, and employment application—does not save the case from the preemption explicitly intended by Congress when it passed IRCA. The majority concludes this is an as-applied, express preemption, citing 8 U.S.C. § 1324a(b)(5), which states: "A form designated or established by the Attorney General under this subsection *and any information contained in* or appended to such form, may not be used for purposes other than for the enforcement of this chapter and sections 1001, 1028, 1546, and 1621 of Title 18." (Emphasis added.)

This rationale is sweeping because 8 U.S.C. § 1324a(b) requires an employer to verify that an "*individual*" is not an unauthorized alien, which means employers must verify *all* job applicants irrespective of their immigrant or nonimmigrant status. Under the majority's view, federal law effectively prevents *any* prosecution under the Kansas identity theft crime occurring in the employment context if it relies on information that also just happens to be on or attached to a Form I-9. This cannot reflect congressional intent.

The crux of the express preemption question is whether the phrase "any information contained in" the form applies literally to all information on the Form I-9, wherever else it might be found; or more narrowly to the contents of the completed Form I-9. While the majority takes the former view, I take the latter because the Form I-9 and the W-4 and K-4 forms were supplied for different and independent purposes. In Garcia's case, the Form I-9 was not admitted into evidence, so no information *necessarily* gleaned from it was "used" in the State's prosecution. Garcia was not convicted for using someone

else's identity on Form I-9 to deceive his employer as to his work authorization. Instead, Garcia was convicted for using another person's Social Security number on tax withholding forms.

The majority reaches its decision through a unique and overly literal interpretation of 8 U.S.C. § 1324a(b)(5). The majority reads the provision to create a congressional "information-use preemption" rather than a "Form I-9-use limitation." In doing so, the majority stretches statutory interpretation past the breaking point and dismisses contrary caselaw.

In *Puente Arizona v. Arpaio*, No. CV-14-01356-PHX-DGC, 2016 WL 6873294 (D. Ariz. 2016), a federal district court looked at this same statutory language and ruled Congress preempted "a relatively narrow field: state prosecution of fraud in the I-9 process." 2016 WL 6873294, at \*12. That same court in a follow-up opinion most recently explained the scope of this preemption by stating:

>"In summary, the Court concludes that Congress clearly and manifestly intended to prohibit the use of the Form I-9, documents attached to the Form I-9, and documents submitted as part of the I-9 employment verification process, whether attached to the form or not, for state law enforcement purposes. Further, as the Supreme Court found in *Smith v. United States*, 508 U.S. 223, 228 (1993), the ordinary meaning of the term 'use' is '"to employ" or "to derive service from."' *Id.* at 229 (quoting *Astor v. Merritt,* 111 U.S. 202, 213 [1884]); see also Black's Law Dictionary 1681 (9th ed. 2009) (defining 'use' as the 'application or employment of something'). The Court will adopt this ordinary meaning of the word 'use.' Thus, the Court holds that Defendants are preempted from (a) employing or relying on (b) any documents or information (c) submitted to an employer solely *as part of the federal employment verification process* (d) for any investigative or prosecutorial purpose under the Arizona identify theft and forgery statutes. *As Plaintiffs concede, Defendants may use List A, B, or C documents submitted in the I-9 process if they were also submitted for a purpose independent of the federal employment verification system, such as to demonstrate ability to drive or as part of a typical*

*employment application.*" (Emphasis added.) *Puente Arizona v. Arpaio*, No. CV-14-01356-PHX-DGC, 2017 WL 1133012, at * 8 (D. Ariz. 2017).

The *Garcia* majority attempts to minimize the *Puente Arizona* court's analysis by asserting "no party was urging express preemption." 306 Kan. at __, slip op. at 18. But a careful review of both the 2016 and 2017 district court decisions demonstrate that the court did not "overlook" the language in 8 U.S.C. § 1324a(b)(5). The *Puente Arizona* court was familiar with the statutory language and the arguments arising from it—including express preemption. The court simply interpreted the law differently than the majority does.

Indeed, no other court has interpreted 8 U.S.C. § 1324a(b)(5) as the majority has. There are several decisions, including those from our own state, that have come to opposite or unsupportive conclusions. For instance, in *Arizona v. United States*, 567 U.S. 387, 406, 132 S. Ct. 2492, 2504, 183 L. Ed. 2d 351 (2012), the United States Supreme Court noted, "IRCA's express preemption provision, which in most instances bars [s]tates from imposing penalties on employers of unauthorized aliens, is *silent about whether additional penalties may be imposed against the employees*." (Emphasis added.) The *Arizona* Court recognized IRCA's express preemption provision on the employer side but not on the employee side of the equation.

The Iowa Supreme Court recently held that state's identity theft law is not facially preempted by IRCA. *State v. Martinez*, 896 N.W.2d 737, 755 (Iowa 2017). Instead, a bare majority of the *Martinez* court held *implied* preemption theories applicable to that state's identity theft law, which is largely similar to ours. Compare K.S.A. 2012 Supp. 21-6107(a) ("Identity theft is obtaining, possessing, transferring, using, selling or purchasing any personal identifying information, or document containing the same, belonging to or issued to another person, with the intent to . . . receive any benefit."), with Iowa Code § 715A.8(2) (2013) ("A person commits the offense of identity theft if the person

33

fraudulently uses or attempts to fraudulently use identification information of another person, with the intent to obtain . . . benefit."). Both Kansas' and Iowa's statutes are alike in that they apply to any person, regardless of immigration status, and they apply in any situation—not just the employment authorization verification process.

Another example is *State v. Reynua*, 807 N.W.2d 473, 479-81 (Minn. App. 2011). In that case, the *Reynua* court stated, "[W]e cannot read [8 U.S.C. § 1324a(b)(5)] so broadly as to preempt a state from enforcing its laws relating to its own identification documents." 807 N.W.2d at 480-81. The court reasoned, "It would be a significant limitation on state powers to preempt prosecution of state laws prohibiting falsification of state-issued identification cards, let alone to prohibit all use of such cards *merely because they are also used to support the federal employment-verification application*." (Emphasis added.) 807 N.W.2d at 481. The *Reynua* court's rationale fully protects federal interests, while the *Garcia* majority's broad reading of 8 U.S.C. § 1324a(b)(5) constitutes a "significant limitation" on our state's police power to protect its citizens from identity theft.

The *Garcia* majority's rationale also runs counter to a unanimous string of Kansas Court of Appeals decisions that have expressly considered this question. See *State v. Ochoa-Lara*, 52 Kan. App. 2d 86, 91, 362 P.3d 606 (2015) ("There is nothing in the [federal] preemption language that prohibits the State from proving identity theft by using information from sources other than the I-9 form, even though that information may also be contained on the I-9 form and the documents appended thereto."); see, *e.g.*, *State v. Jasso-Mendoza*, No. 113,237, 2017 WL 2001347 (Kan. App. 2017) (unpublished opinion); *State v. Hernandez-Manrique*, No. 110,950, 2016 WL 5853078 (Kan. App. 2016) (unpublished opinion); *State v. Morales*, No. 111,904, 2016 WL 97848 (Kan. App. 2016) (unpublished opinion).

Despite my conclusion that as-applied express preemption is not applicable, I admit to being attracted to the notion that the Kansas statute is preempted as applied in this case under implied theories of either field or conflict preemption, as the Iowa Supreme Court majority recently held. See *Martinez*, 896 N.W. 2d at 755. The possibility of dual enforcement tracks—state and federal—is concerning because of the prosecutorial discretion contemplated in the federal IRCA statutory scheme and the discretion our state affords to its prosecutors. See *In re Holste*, 302 Kan. 880, 889-90, 358 P.3d 850 (2015) ("We have long acknowledged that prosecuting attorneys have broad discretion in deciding whether to charge someone with a crime."). Spotty statewide enforcement would seem to manifest the evil—robing the federal government of its discretion—foreseen by Iowa's Chief Justice Cady in his separate *Martinez* concurring opinion. *Martinez*, 896 N.W. 2d at 758-59.

This apprehension is particularly noteworthy because the identity theft cases reaching our Kansas appellate courts involving unauthorized immigrants seem to be arising from just one prosecuting jurisdiction, which suggests other Kansas prosecutors may be exercising their discretion differently. I would view an as-applied conflict preemption challenge raised under the proper facts to be a close call. But in the end, the balance is tipped by our state's longstanding caselaw recognizing that "'"[i]n the absence of express preemption in a federal law, there is a strong presumption that Congress did not intend to displace state law." [Citation omitted.]'" *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 296, 255 P.3d 1186 (2011) (quoting *Zimmerman v. Board of Wabaunsee County Comm'rs,* 289 Kan. 926, 975, 218 P.3d 400 [2009]).

This strong presumption, combined with the caselaw recited above and my concern about the sweeping potential impact of the majority's rationale, cause me to dissent.

\* \* \*

STEGALL, J., dissenting:  I join Justice Biles' dissent fully with respect to express preemption. Today's decision appears to wipe numerous criminal laws off the books in Kansas—starting with, but not necessarily ending with, laws prohibiting identity theft. For this reason, I doubt the logic of today's decision will be extended beyond the narrow facts before us. But rather than take solace in this hope, I find in it the irrefutable fact that today's logic is wrong.

"It is well established that within Constitutional limits Congress may pre-empt state authority by so stating in express terms." *Pacific Gas & Elec. v. Energy Resources Com'n*, 461 U.S. 190, 203, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983). Thus, as a first principle, Congress cannot preempt state law in matters that lie outside Congress' limited, prescribed powers. Moreover, additional limits on federal preemption have been crafted to guard the prerogatives of states in order not to "disturb" the "federal-state balance." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S. Ct. 1305, 51 L. Ed. 2d 604 (1977).

Even if the majority's interpretation of 8 U.S.C. § 1324a(b)(5) (2012) is correct, and Congress intended to expressly preempt state use of all information contained in a person's I-9 form, it is doubtful Congress has such sweeping powers to interfere with the legitimate government of the states. Can it really be true that the state of Kansas is or could be expressly preempted from using—for any purpose—the name of any citizen who has completed an I-9 form? A name is "information" after all. To ask the question is to answer it.

Therefore, even if I were convinced by the majority's statutory analysis—I am not—I would question the majority's implicit holding that Congress has, in the first place, the constitutional power to prohibit states from using any *information* found on a federal

36

I-9 form. If such a power *did* exist, the delicate federal-state balance achieved by our system of federalism would not merely be disturbed, it would be obliterated.

Finally, I likewise join my colleague in dissent with respect to implied preemption. Unlike Justice Biles, however, I do not find the question a particularly close call.

For these reasons, I respectfully dissent.